## DAVIS VS PRYOR.

### Opinion delivered October 6, 1900.

*1. Breach of Promise—Incapacity to Contract Marriage—Complainant's Knowledge Thereof—Evidence.*

> In an action against defendant for breach of marriage promise, where complaint alleges that defendant was a single man and capable of making a marriage contract, and defendant claims the existence of a common-law marriage by which he is incapacitated from marrying another person, and that complainant was aware of the relations between defendant and his common-law wife, it is not error to permit testimony, on part of plaintiff, that defendant frequently represented to her, and to others, that he was a single man, and the woman living with him was his housekeeper, and of other witnesses that the woman was not reputed nor understood to be defendant's wife in the vicinity of their residence; and the refusal to direct a verdict for defendant was proper.

*2 Instructions—Common Law Marriage—Existence of, a Question of Fact for Jury.*

> Where the evidence was that defendant had cohabited with a woman for a number of years, but conflicted as to whether they were reputed to be man and wife, and held each out as such to the public, it was error for the court to instruct the the jury that a common law marriage existed and they constituted man and wife, as that was a question of fact for the jury to determine, under proper instructions as to the facts necessary to constitute and establish a common-law marriage.

*3. Married Person, by Promising Marriage to Innocent Person, Becomes Responsible in Damages.*

> Where the plaintiff promised to marry the defendant under the honest belief that he was a single man, and in ignorance of the fact of his marriage, the defendant is not relieved from his responsibility in damages to the other contracting party, by reason of his married state.

4. *Ignorance of the Law—Induced by Misrepresentation.*

And although the plaintiff knew of the fact of defendant's relations with his reputed wife; yet if she was in ignorance of the legal effect of such relations, and this erroneous conclusion was brought about by the fraud or imposition or misrepresentations of the defendant, who knew of his incapacity to enter into marriage because of such relations, the defendant is not thereby relieved from his liability in damages.

And, where the record did not disclose that plaintiff "knew of the facts necessary to constitute a common law marriage," it was error for the court to instruct the jury that, if they found she knew of the existence of such facts, she was bound by their legal effect.

5. *Instructions—Erroneous but Not Prejudicial—Not Ground For Reversal.*

Where erroneous instructions are given which are not prejudicial to defendant, but directly beneficial and favorable to him, he is not thereby entitled to a reversal of the case because of such errors.

6. *Instructions Properly Refused When Covered by the Whole Charge.*

The refusal to give certain requested instructions which correctly state propositions of law involved in the case, is not error when they are fully covered by the whole charge to the jury.

7. *Damages for Seduction Outside the Territory Properly Included.*

In an action for breach of marriage promise, when seduction is alleged in aggravation of the damages, it is properly considered as an element of damage, notwithstanding the act of seduction took place outside the Indian Territory.

8. *Damages—Evidence—Indirect and Circumstantial.*

Where an element of damage, claimed in an action for breach of marriage promise, and seduction committed thereunder, is the circulation by defendant of the story of such seduction, and this circulation of reports is not sustained by any direct evidence, but facts were proven from which the jury might reasonably infer that defendant had circulated such reports, an instruction that the jury might consider such conduct of the defendant in estimating the damages to plaintiff, is not improper.

9. *Verdict—Quotient—Examination of Juror to Ascertain How Verdict Found, Improper.*

> Under Mansf. Dig. Sec. 2298 (Ind. Ter. Stat. Sec. 1641) a juror cannot be examined to establish a ground for a new trial, except to show that a verdict was obtained by lot. The jury agreed to divide the total of what each juror thought should be the amount of the verdict, by twelve, and render a verdict for the result, but after arriving at the quotient one juror refused to render so large a verdict and insisted on a smaller sum; but afterward consented to an increase, but to an amount still less than the sum derived from their first calculation. *Held*, Such verdict cannot fairly be considered a quotient verdict nor a verdict by lot, and same is not invalid on such grounds.

Appeal from the United States court for the Northern district.

WILLIAM M. SPRINGER, Judge.

Action by Rose Pryor against Sam T. Davis. Judgment in favor of plaintiff. Defendant appeals. Affirmed.

The plaintiff brought this suit to recover damages for a breach of promise of marriage. She alleged that she was about 20 years old, and the defendant was about 40 years old; that in the month of December, 1896, the defendant represented himself to be a single and unmarried man, and that he made an offer of marriage to the plaintiff, which was accepted, and that during that month he made a false promise of marriage to this plaintiff, which the defendant failed and refused to carry out. She alleges that she was an innocent, ignorant country girl, and that the defendant was a man of broad experience and attractive demeanor; that on or about the 22d day of December, 1896, relying upon the promise of marriage of the defendant, she went with him to Hot Springs, Ark., and that trusting to the said promise of marriage, while at Hot Springs., Ark., the defendant seduced the plaintiff; that subsequently he refused to carry out his contract and promise of marriage, to the plaintiff's damage $10,000; that defendant afterwards maliciously and openly

circulated the story of his seduction and ruin of plaintiff; that plaintiff has been ruined by defendant's conduct and willful deceit, and by these acts she has been damaged in the sum of $15,000, and asks for judgment for $25,000. The defendant in his answer denies that he was a single and unmarried man, or that he represented himself to the plaintiff to be such; he denies tnat he made an offer of marriage to the plaintiff in the month of December, 1896, which was accepted by the plaintiff; denies that he made a false promise of marriage, which he failed or refused to carry out; and the defendant denies each and every allegation alleged by the plaintiff, and especially that he at any time made a promise of marriage, or that he seduced the plaintiff under a promise of marriage. The case was tried by a jury, and a verdict returned for the plaintiff for $9,500. The defendant moved for a new trial, which was overruled by the court, judgment was entered on the verdict, and the defendant appealed to this court.

*Shackelford & Shackelford, Hutchings & West, Maxey & Martin*, and *James Brizzolara*, for appellant.

*W. F. Seaver* and *N. A. Gibson*, for appellee.

TOWNSEND, J. The appellant has filed 21 assignments of error, but confines has argument upon them to five separate propositions. The first proposition is that the first and second assignments of error be considered together. They are as follows: "(1) The court erred in refusing defendant's motion to direct the jury to return a verdict for defendant at the close of plaintiff's testimony, because the plaintiff had wholly failed to make out a case against the defendant, which was duly excepted to at the time. (2) The court erred in overruling defendant's motion to direct a verdict for defendant at the close of all of the testimony, because, under the testimony, the plaintiff was not entitled to recover." The argument of counsel upon this proposition is thus stated: "One of the material allegations in plaintiff's

Common law
marriage.
Evidence of

complaint is that the defendant was at the time of the alleged contract of marriage a single man, and capable of making such a contract. The evidence is overwhelming, and the court so instructed the jury, that the defendant was a married man at that time.'' As these assignments of error raise the question of the sufficiency of the testimony to sustain the plaintiff's allegation, and the court refused to direct a verdict, but allowed the same to be considered by the jury, who returned a verdict for the plaintiff, which the court, after full argument, refused to set aside, we think it proper to give the following extracts from the testimony of the witnesses upon the point thus assigned as error by appellant's counsel.

The plaintiff testified upon that point as follows: "Q. At what age did you come to the Indian Territory? A. Six years old. Q. Who did you come with? A. My father and mother. * * * Q. State where you have been living from the time your father moved to the Indian Territory until you came to Muskogee. A. Near Bryertown, Cherokee Nation. Q. How far from where the defendant, Sam T. Davis, lived? A. Six or seven miles. Q. How long have you known Sam Davis? A. Four or five years. * * * Q. When did your mother die? A. When I were nine years old. * * * Q. How and where did you live then after her death until you were fourteen years old? A. I still lived with my father. Q. State whether or not your father remarried and, if so, how old you were when he married again. A. He married in about eighteen months after mother died. Q. How old were you at that time? A. I was eleven years old, I think. Q. How did you and your stepmother get along? A. Got along very well for a while, until my stepmother was married about two years, and then we did not got along from that time on. Q. Then what did you do? A. I left home, and went to Mrs. Star's. * * * Q. What was your age when you went to Mrs. Star's? A. Fourteen. Q. How long did you stay with her? A. I stay-

ed there nine or ten months. Q. Then what did you do? A. I went to work for Sam Dulaney. Q. How long did you work there? A. About a year. Q. Where did you go to from there? A. I went to Mr. Thompson's. Q. What Thompson? A. Jack Thompson. Q. How long did you stay there? A. About two or three weeks. Q. Where did you go from there? A. Sam Davis'. Q. How long did you stay at Sam's? A. About three months. Q. Where did you go from there? A. Went back to Sam Dulaney's. Q. How long did you stay there? A. I stayed there about a week, and from there I went to Mrs. Robins', and stayed there about eighteen months. Q. Then where did you go to? A. Went back to Sam Davis'. Q. How long did you stay there then? A. I stayed there three months. Q. Then where did you go to? A. Back to Mrs. Robins'. Q. Then where? A. Frank Vore's. Q. Where from there? A. Back to Mrs. Robins. Q. How long did you stay at Mrs. Robins' altogether,—about how long? A. I stayed there 18 or 20 months. Q. How long did you stay at Vore's? A. Five or six weeks. Q. Then where did you go to from Mrs. Robins'? A. Mrs Ingram, now. Mrs. Star, then. Q. How long did you stay there then? A. Until I went away with this defendant. Q. What was the treatment of the defendant during the first three months you stayed at his house? A. As nice and polite as could be with me. Q. What was his treatment when you returned next time? A. When 'Cinda was there nice and polite as could be, but when she was gone he was around talking to me. He would say, 'Let's leave here, and get married, and not come back here.' I told him that he has got a wife. He said, 'I have not.' I said, 'Then why are you living with 'Cinda for then?' He said, 'She is just my housekeeper, not my wife; she don't love me and don't treat me good, and I am going away from here, and not going to live with her.' Q. Were these protestations often or only occasional? A. Yes sir; they were often.

(27)

Q. And you say at the end of three months you left there. Why did you leave? A. I told him I would leave him if he did not quit bothering me and talking to me about going away and getting married. He insisted on my staying. I told him, 'No;' I told him I would not stay if he did not quit insisting. I said, 'I don't want to marry a man that has a wife.' Q. What did he then say? A. That he was not married to 'Cinda, and did not want to marry her, and would not. Q. Did you ask anybody to find out whether he was married or not? A. I asked Mrs. Ingram. Q. What did she say? (Defendant objects to the question. Objection sustained by the court.) Q. After you left Sam Davis the second time, when did you next see him? A Saw him in about a week afterwards. Q. Whereabouts? A. At Webber's Falls. Q. Where were you staying then? A. At Mrs. Robins'. Q. Talk to you any then? A. Yes, sir. Q. What did he talk to you about then? A. He still talked to me about going away and getting married. Q. When did you next see him? A. I don't know; I think about two weeks. Q. Where at? A. At Frank Vore's. Q. At Frank Vore's? A. Yes, sir. Q. What did he have to say to you then? A. Didn't have anything to say me then. Q. When did you next see him? A. I saw him at Mr. Vore's again. Q. Say anything to you at that time? A. Yes, sir. Q. What was it? A. He still wanted me to go away and get married to him. Q. What did you tell him? A. That I would not go; that I did not want to go with him; that he was a married man, and that I would not go with him. Q. What did he say about being a married man? A. That he was not; that he never was married to that woman, and never would marry her. * * * Q. I will ask you whether or not from the time you left his house until the time you seen him at Star Villa, if you got any communications from him. A. Yes, sir. Q. How many? A. Two. * * * Q. What was in the second one? A. Wanted to know if I would not go and

work for him again, or if I was not ready to go away and get married. I took the letter and burned it up. I never told any one that I got a letter from him. * * * Q. What year did you go away with him? A. It was in 1896 that I went away with him. Q. Was that the time you seen him, then, down here? A. 1896; yes, sir. Q. What did he say to you then? A. He asked me if I wasn't ready to go away with him and marry him. I said, 'No, Mr. Davis, I am not ready, and I don't want to go with you; you have got a wife, and I don't want to take any woman's husband from her.' Q. What did he say? A. That she is not his wife; that she is just keeping house for him. 'All I wanted was to make my fortune, and I have made my fortune.' * * * Q. When did you next see him? A. I saw him about two weeks afterwards, I guess. Q. What arrangement, if any, was made at that time? A. There was no arrangement made at all. He was just talking, and asking if I would not go away and get married. Q. Now, about that time, I will ask you to state whether anybody else talked to you about going away with Sam Davis, and who it was? A. Yes, sir; Mrs. Star; Mrs. Ingram, it is now. Q. When and where was the final arrangements made for you to go away from here with the defendant? A. Down at Mrs. Star's. Q. At Mrs. Ingram's? A. Yes, sir. Q. Under what circumstances did you happen to make those? A. By him promising to go away from here, and as soon as we get out of the Indian Territory, or to Hot Springs, that we get married. And he promised that he never would come back here any more; that he might come close some time, but not here; that he had nothing to come back here for; that he had little business to attend to, but that he would not have to come back here to attend to that. Q. Did he or did he not state that he had disposed of his property here? A. Yes, sir; he said that he had everything arranged so that he could go away any day he wanted to. Q. State whether

or not you afterwards agreed to marry him and go away with him. A. Yes, sir. Q. When? A. I did. Q. When did you make that arrangement? A. The last time he was up here. Q. When was it? A. A week before we went away. Q. When did you go away? A. The 22d of December. * * * Q. State whether or not you told any one about your intention to go away with him. A. I told Mrs. Ingram. Q. You may state whether or not Mrs. Ingram approved of your going away with him? A. Yes, sir.''

Mrs. Ingram, witness. for plaintiff, testified: ''The Court: Who do you refer to as 'he'? A. Mr. Davis; that is the man in question. Mr. Seaver: Q. What did he say to you? Did he ask you to assist him? A. He told me that he had never enjoyed life since living with the present woman; that they were never married; that life was too short to be a spending it the way he was, and that he was going to take this girl away. Said that he had sold everything that he had, and put it in government warrants. I said, 'What will you do with the old lady?' He said he would leave her here: that he had turned money over to Frank Vore to pay some expenses for her. When he was talking to me about the girl I supposed he was in earnest. I never asked him. I did not question the matter, and when the girl came to me, and asked me, 'What would you do about it?' I said, 'I don't know.' 'As to Sam Davis being married, I never heard of that. As to his making you a living, that is a settled fact. You know that; that he will make you a good living, you know; and as to his making you a good husband, you have been living with them, and know his disposition.' She said, 'He is too old.' I made the remark that it is 'better to be an old man's darling than a young man's slave.' You may call it slang; I never thought I would have to repeat it. I said, 'Marrying Sam Davis would beat dragging a cotton sack in a cotton patch with your young ones, which you would have to do if you married a poor man.' In a few days she came to me

with a letter sending some money to come to Illinois Station, and asked me how to go to Illinois Station.  Q.  Did he ask you to talk to the girl for him?  A.  He told me that I must use my influence with her.  Q.  What did you say to him?  A.  I don't know what I did say to him.  I guess I told him I would use my influence.  Q.  Did you or not interrogate him as to whether he was in earnest?  A.  I said, 'Davis, is this for play or for a fact?'  He said it was for a fact.  Him and I had come up town here in a buggy.  We talked the matter over as we went back.  Q.  Now, Mrs. Ingram, I will ask you if you would have used your influence with the girl to get her to go with Sam Davis if he had not told you he was going to take her away and marry her?  A.  No, sir; if he had told me that he was going to mistreat the girl I am the last one on earth that would have told him to do that.  *  * Q.  Now, I will ask you if you know what the rest of the Star family--brothers and sisters--consider the relation that exists between 'Cinda and Sam Davis.  A.  If they ever married, they did not do it as far as I know.  Q.  What did they think of the relationship?  A.  Did not broach it much, but, like any other old thing, it became old.  Q.  I will ask you whether you ever had a conversation with the defendant, Sam Davis, in which he acknowledged or stated the relation that he was living with 'Cinda.  A.  He told me that he had never been married."  On cross-examination, Mrs. Ingram testified: "Q You say that Davis' wife here was a sister of your husband, Star?  A. Yes, sir.  *  *  *  Q.  Tell this jury, from 1881 (May, 1881), whether Mrs. Davis has been held out to the world and reputed to be the wife of Sam Davis.  A.  She was called his wife, but everybody knew that they were not lawfully married "

Mrs. Robins, witness for plaintiff, testified:  "Q· How long have you known Sam Davis?  A.  I guess about eighteen or twenty years; I don't remember.  Q.  I will ask you to state if you know what the general understanding is

in that neighborhood as to whether the man Sam Davis and the woman Lucinda Davis were ever married. A. I know nothing about that at all. Q. Have you not heard it canvassed in that neighborhood? A. Yes, sir. Q. What is the general understanding? A. That they never was."

The defendant testified for himself as follows: "Q. Your name is Samuel T. Davis? A. Yes, sir. Q. You are the defendant in this action? A. Yes, sir. Q. Tell this jury when you began to live with your wife, and how you began to live with her? A. In May, 1881, we contracted to live together as man and wife. Q. What was your contract? A. That we would live together and treat each other as man and wife. Q. Ever have intercourse before that? A. No, sir. * * * Q. Tell this jury whether you ever told this plaintiff, Rosey Pryor, or Mrs. Ingram, or anybody else, that you were not married. A. Never did; always claimed that I was married to my wife, as I stated here a while ago. I always recognized her as my wife, and expect to in the future."

It is our opinion that this evidence was proper to go to the jury, and be considered by them, to determine the question whether defendant was a married or single man. The court below gave the following instructions to the jury upon this question:

"First. That the testimony in this case fully establishes the fact that the defendant and his reputed wife entertained such relations to each other by matrimonial cohabitation, by holding each other out to the community as man and wife, and by the general recognition of the neighborhood in which they lived, as to constitute them man and wife, and that, by reason of such relations existing between the defendant and his reputed wife, he was at the time of the inury complained of in this case incapacitated on his part from contracting a marriage alliance with any other woman.

"Second. The relations however which existed between the defendant and his reputed wife, and which incapacitated him from making a valid and binding contract of marriage on his part, do not necessarily relieve him from the consequences of any marriage contract that he may have made with the plaintiff in this case, if you believe from all the evidence that she, when such alleged promise was made, was honestly and in good faith of the opinion and belief that the defendant was free to contract a lawful matrimonial alliance, and that such belief was induced by the misrepresentations of the defendant.

"Third. It is conceded in this case that the plaintiff well knew of the facts which were necessary to constitute a marriage between the defendant and his reputed wife, and if you believe from the evidence in this case that she reached an erroneous conclusion as to the legal effect of the facts known to her, without any deception or undue advantage taken of her, or fraud practiced upon her, by the defendant, she is in law bound by the legal effect of such known facts, and, if you should so believe from the evidence in this case, the court instructs you that the plaintiff cannot recover, and that you should find for the defendant.

"Fourth. The court instructs you that a mistake or ignorance of the law happens when a person, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect; and if you believe from the evidence in this case that the plaintiff was in full possession of all the facts which have been brought out in evidence with reference to the relations existing between the defendant and his reputed wife, and that such erroneous conclusion, as to the legal effect of such relations, was brought about by the fraud or imposition or misrepresentations of the defendant, and if you further find and believe that the defendant knew the legal effect of the relations which existed between him and

his reputed wife, which would incapacity [incapacitate] him from making a lawful marriage contract with the plaintiff, and that he took advantage of her ignorance of such legal effect of the facts known to her, induced her to believe that he could legally marry her, and that she honestly and in good faith believed in the false and fraudulent statements thus made to her, and that she was ignorant of the legal effect of the facts which were known to her, in that event you should find for the plaintiff."

It will be observed that the court below in his first instruction above quoted told the jury as a matter of law, based upon the evidence in the case, that the defendant was incapacitated to make a marriage contract, and that the facts disclosed by the testimony, constituted the defendant and the woman with whom he was living man and wife. We think this instruction was erroneous. In our judgment, the facts should all have been submitted to the jury, as they were, but with proper instructions as to what constituted a marriage at common law, and what presumptions obtained from certain acts of parties living and cohabiting together, and have left it for the jury to say whether the defendant was a married man or not. Allen vs Hall, 10 Am. Dec. 578; Fenton vs Reed, 4 Am. Dec. 244.

**Instructions. Incapacity to contract marriage.**

The second instruction above quoted tells the jury that, notwithstanding the incapacity of the defendant to enter into a marriage contract with the plaintiff, yet this did not relieve the defendant from the consequences of his contract with the plaintiff, if the plaintiff at the time the contract was made "was honestly and in good faith of the opinion and belief that the defendant was free to contract a lawful matrimonial alliance, and that such belief was induced by the misrepresentations of the defendant." The law unquestionably is settled that a married person can enter into a contract of marriage, and thereby become responsible in

**Married person may enter into marriage contract.**

damages to the other contracting party, provided the party with whom the married person contracts is ignorant of the fact that the person is married; otherwise, there is no con- sideration to support the contract. Kelley vs Riley, 106 Mass. 339; Coover vs Davenport, 1 Heisk, 368; Pollock vs Sullivan, 53 Vt 507. And, while the foregoing instruction is inaptly stated, we think it is not objectionable.

The third instruction above quoted, states it is con- ceded, that the "plaintiff well knew of the facts which were necessary to constitute a marriage between the defendant and his reputed wife," and if she arrived at an erroneous con- clusion as to the legal effect of the facts known to her, with- out any fraud being practiced upon her by the defendant, that she is bound by the legal effect of such known facts, and, if the jury so believe from the evidence, the plaintiff cannot recover, and the jury should find for the defendant. This instruction is in conflict with the second instruction above quoted, as it assumes the plaintiff is aware of the facts constituting the defendant's married state. We have examined the record with some care to ascertain where it was conceded that the "plaintiff well knew of the facts which were necessary to constitute a marriage between the defendant and his reputed wife," and we have failed to find any such concession by the plaintiff or her counsel. If it had been conceded that plaintiff "well knew of the facts," it could not be said she "was honestly and in good faith of the opinion and belief that the defendant was free to contract a lawful matrimonial alliance." This was a material issue, and representations falsely made by defendant to plaintiff were false representations of the facts, for which he could be called upon to respond in damages.

Instruction. Ignorance of the law.

The fourth instruction above quoted is substantially in harmony with the second instruction; the court below in- structing the jury that, if they believe "that the defendant

knew the legal effect of the relations which existed between him and his reputed wife, which would incapacity [incapacitate] him from making a lawful marriage contract with the plaintiff, and that he took advantage of her ignorance of such legal effect of the facts known to her, induced her to believe that he could legally marry her, and that she honestly and in good faith believed in the false and fraudulent statements thus made to her, and that she was ignorant of the legal effect of the facts which were known to her, in that event you should find for the plaintiff." This leaves the jury to say whether the plaintiff was or not aware of the fact that the defendant was a married man. False representations made by a man nearly 50 years old to a young and ignorant girl of 18 upon the subject of his own marriage should be regarded as misrepresentation of facts and not misrepresentations of legal conclusions. The jury evidently took this view of the case in finding their verdict, and, while we are of the opinion that the first and third instructions were erroneous, are they prejudicial to the defendant? They were directly beneficial to him, and it is well settled that errors in instructions directly beneficial and not prejudicial to the party complaining is not reversible error.

The second proposition presented by appellant is that assignments of error from 3 to 10 relate to instructions requested by defendant and refused by the court, and that errors assigned from 11 to 20, inclusive, relate to exceptions taken to certain parts of the charge of the court to the jury. Appellant insists that the instructions requested should have been given, because all contain correct propositions of law. We think they were fully covered by the charge given to the jury, and the assignments of error from 11 to 20 we are of the opinion are not well taken, except as hereinbefore discussed. No authorities are cited to sustain this second proposition, and we deem it unnecessary to further refer to it.

*Instructions. Covered by general charge*

The third proposition presented by appellant is that 'the eighteenth error assigned contains an instruction which is particularly objectionable, for the reason that the court tells the jury that they may consider the act of seduction in aggravation of damages, when the testimony shows that the seduction occurred, if at all, beyond the limits of the Indian Territory, and could not, therefore, be taken in consideration in assessing damages." The instruction complained of is as follows: "Tenth. The court instructs the jury that if you find that the plaintiff, while attempting to carry out a contract for marriage, entered into by herself and the defendant, left the Indian Territory with the defendant, and was seduced by the defendant, you may consider the act of seduction as an aggravation of the damages resulting to the plaintiff from the failure of the defendant to carry out the said contract of marriage." It is well settled that evidence of seduction is admissible in aggravation of damages, as charged by the court. See note to Weaver vs Bachert, 44 Am. Dec. 178; also see note to Burnham vs Cornwell, 63 Am. Dec. 545, and cases cited. But the appellant fails to cite any authority to sustain the proposition that evidence of the seduction beyond the territorial limits of the state or territory where the promise was made or the suit is pending is inadmissible.

Seduction.
Aggravation
of damages.

The forth proposition presented by appellant is the nineteeth error, which is assigned to the following instruction of the court, viz : ''And the court further instructs you that if you find from the evidence that the defendant made a contract for marriage with the plaintiff, as set forth in these instructions, and afterwards refused to carry out the same, and after such refusal circulated the facts of his seduction of the plaintiff, and of his relations with her, that you may take such conduct on the part of the defendant in consideration in determining the measure of damages to be awarded plaintiff.'' It is not claimed that this instruction did not

correctly state the legal principle applicable to the facts alleged and denied, but that there was no evidence upon which to base the instruction. The rule is well laid down in Railway Co. vs Lewis, 109 Ill. 134: "It has been held by this court, in cases where there was no direct evidence of a material fact, that circumstances proven from which the fact might reasonably be inferred would be sufficient on which to base an instruction. It was so ruled in Railroad Co. vs Gregory, 58 Ill. 272, and also in Furnace Co. vs Abend, 107 Ill. 44." In Bradford vs Pearson, 12 Mo. 73, it is said: "It is not, however, indispensable to the giving of an instruction that the evidence should establish conclusively the hypothesis stated therein. If there be any evidence conducing to establish the assumption, it is sufficient to authorize the giving of the instruction, and it will be for the jury to find whether the facts stated are made out by the evidence. But, if it were that there was no evidence upon which to found the instruction, still this court would not reverse the judgment for that reason, unless it was apparent that the jury had been misled by the instruction." We think the testimony was sufficient to support the instruction.

The fifth proposition presented by appellant is that the twentieth, and twenty-first assignments of error be considered together. The twentieth is the exception to overruling defendant's motion for new trial, and the twenty-first assignment of error is as follows: "The court erred in receiving and entering judgment on the verdict of the jury in this cause, because the evidence shows that said verdict was a quotient verdict." The defendant sought to sustain this assignment of error by the examination of Mr. Bell, the foreman of the jury, which was as follows: "Mr. Hutchings: We desire to call Mr. Bell, a juror. Mr. Gibson: We object. Objection overruled; and Mr. Bell, called as a witness on the part of the defendant, having been first duly sworn, testified as follows, to wit: Mr. Hutchings: Q. You

were the foreman of the jury in the case of Rose Pryor against Davis? A. Yes, sir. Q. Will you tell his honor how you gentlemen arrived at your verdict,—the amount? A. Well, it would be rather a hard matter to tell how we did. In the first place, we each set down the amount that he was willing to give. Then we added it all together, and divided it by twelve. It was the understanding with us that the division of twelve would be satisfactory to all. It seemed that it· was not. Then the division was $13,400 and something,—quotient. We agreed to come down to $10,000, and one of the jurors would not agree to that. He finally came up to five thousand, and then we split the difference between five thousand and ten thousand by dividing it by twelve. I said, 'No use voting any longer this way no use voting unless we agreed to stand by that.' We put it down again, and, after this juror came up to $5,000, each of the eleven would set down what he was willing to allow. At last there were eleven for $10,000, and then there was one for five thousand,—eleven of us for ten thousand each, and then there was one voted for five thousand, and we agreed to strike a line between that, and divide the quotient by twelve. Q. Did you agree then that you would stand by what the result would be? A. Yes, sir: that was the agreement before we took that last vote. Then we came down; it was nine thousand and some five hundred and eighty-two or three,—some odd difference; and he finally says, 'Just make it even $9,500, and we all agreed to it; and the verdict was made that way." Cross-examination: "Mr. Gibson: Q. I understand that this quotient you obtained by the last division was $9,580? A. Yes, sir; something over. Q. Thereafter the jury discussed the matter, and agreed to cut it down, and give $9,500? A. We agreed after we made that poll to abide by that result, and, after we had divided the amount, that was the last said (just make it even $9,500); and we all agreed to do it, and returned a verdict under that."

It is exceedingly doubtful if, under the statute and decisions in Arkansas, this practice could obtain. The statute is as follows (Mansf. Dig. § 2298; Ind. T. Ann. St. 1899, § 1641): "A juror cannot be examined to establish a ground for a new trial, except it be to establish, as a ground for a new trial, that the verdict was made by lot " In Pleasants vs Heard, 15 Ark. 403, where a juror made affidavit as follows: "That they agreed that each juror should set down in figures the amount of damages he should be in favor of assessing, and that the aggregate of all the sums should be divided by twelve, and the quotient fixed upon as the damages. and that, in pursuance of such previous agreement the jurors proceeded each to set down the amount he was in favor of assessing, and, after all the jurors had thus set down the several amounts, they were added up, and the product divided by twelve, which gave the sum of $620, which was accordingly taken and inserted in the verdict of the jury,"—the court held that, "though there are some conflicting cases. we think it may safely be decided upon authority, and for many good reasons, that the affidavit of the juror Strawn was not admissible in this case to impeach the verdict rendered by him for the cause stated in the affidavit." See, also, Wilder vs State, 29 Ark. 293; Railway Co. vs Cantrell, 37 Ark. 519. From Mr. Bell's examination, it appears that each juror set down a certain amount, and they divided the total by 12, with the understanding that the division by 12 would be satisfactory to all; but it was not. That division was something over $13,400. Then they agreed to come down to $10,000. Still they could not agree, one juror being only willing to $5,000. After much consultation, they made another division, and still they did not agree, but finally did agree on $9,500. This cannot fairly be considered a quotient verdict nor a verdict by chance; and we do not think it comes within the Arkansas statute or decisions, and the exception was properly overruled by the court.

This disposes of all the assignments of error. The only errors, in our judgment, are those heretofore noted, which were not prejudicial to the defendant, and of which he could not justly complain. The jury and court below were evidently of the opinion that the action of the defendant in falsely promising to marry the plaintiff in order to accomplish her seduction and ruin, demanded reparation in damages. We do not feel justified in disturbing that verdict and judgment, and it is therefore affirmed.

CLAYTON, C. J , and THOMAS and GILL, JJ., concur.