MARY CAROLINE RIDDLE, Respondent, v. ISAAC RIDDLE, Appellant.

No. 1451.   (72 Pac. 1081.)

**1. Marriage:  Law of Utah.**

Prior to the enactment by Congress of the Edmunds-Tucker law (Act March 3, 1887, c. 397, 24 Stat. 635 [U. S. Comp. St. 1901, p. 3635]), which went into effect March 3, 1887, the common law on the subject of marriage was in force in the Territory of Utah.

**2. Same:  Common Law.**

Marriage at common law does not arise unless the parties mutually agree to live together as husband and wife for life, to the exclusion of all others.

**3. Same:  Contract at Common Law.**

Notwithstanding that plural marriage is one of the essential doctrines of the Church, the legal status of marriage only exists between parties who, in Utah, before the enactment of any statute on the subject have made a contract of marriage in which they mutually agree to assume the legal obligations of that relation, and who openly cohabit as husband and wife, and hold themselves out to the public as such.

**4. Same:  Facts Stated:  Held no Marriage.**

A man having a legal wife living, married two other women. He cohabited with the three until the death of his legal wife. After that he continued to cohabit with the two women for several years. He introduced one of them, both before and after the death of his legal wife, as his wife. *Held,* that there was no marriage at common law between him and either of the two women.

**5. Same:  Marriage by Justice of the Peace:  Invalid.**

Subsequently the man and one of the women went through a formal marriage ceremony performed by a justice of the peace. The man stated that one of his reasons for marrying was to disqualify the woman from testifying in the event of his arrest. After the ceremony he continued to cohabit with the two women as he had previously done. He told a third woman, whom he

also married, that he had two plural wives, and also told her
about the marriage by the justice, and that that marriage pre-
vented the woman from testifying against him.  *Held*, that the
marriage by the justice was ineffectual to disturb the polyga-
mous relation existing between the parties.

6.  **Same:  Facts Stated:  Held Marriage Invalid.**
At the time of the marriage of plaintiff and defendant, who were
     both members of the Mormon Church, plaintiff knew that de-
     fendant had two wives.   Shortly after the marriage the parties
     went to the home of one of the wives of defendant, where plain-
     tiff was introduced as the wife of another man, and within a
     year the three persons began to live in the same home, and
     for years these women cohabited with defendant as his wives.
     Defendant testified that he married plaintiff as a plural wife.
     The form of the ceremony of the marriage of plaintiff and de-
     fendant was not shown.   The marriage was celebrated in the
     Mormon Church.   At the time that church sanctioned plural
     marriages.  *Held*, that the parties were not legally married.

7.  **Same:  Plural Marriage:  Obligation of Husband:  Moral
     not Legal.**
Though a husband is under a moral obligation to support his plural
     wives and their children, he is under no legal obligation to do so.

(Decided July 14, 1903.)

Appeal from the Fourth District Court, Utah County.
—*Hon. J. E. Booth,* Judge.

Action for separate maintenance on the grounds
specified in section 1216, Revised Statutes 1898.   From
a decree in favor of the plaintiff, the defendant ap-
pealed.

REVERSED.

*M. C. Davis, Esq.,* and *Messrs. Rawlins, Thurman,
Hurd & Wedgwood* for appellant.

*M. M. Warner, Esq.,* and *D. D. Houtz, Esq.,* for
respondent.

Riddle v. Riddle.

STATEMENT OF FACTS.

This is an action for separate maintenance on the grounds specified in section 1216 of the Revised Statutes. It is alleged in the complaint that the plaintiff and defendant intermarried on the 9th of November, 1886. It is alleged in the answer "that at the time of the alleged marriage, and for a long time prior thereto, this defendant had a lawful wife living, to-wit, Mary Ann Riddle, whose maiden name was Mary Ann Eagles, sometimes called Mary Ann Knell, with whom defendant cohabited as his lawful wife until the date of her death, to-wit, on the 14th day of April, 1889; that at all times mentioned in said complaint plaintiff and defendant were and still are members of the Church of Jesus Christ of Latter-Day Saints; that on the 9th day of November, 1886, and while this defendant's lawful wife, Mary Ann Riddle, was living, and while said marriage between this defendant and the said Mary Ann Riddle was subsisting and in full force, plaintiff and defendant, under and in pursuance of the ordinances of said church, of which they were both members as aforesaid, intermarried in the temple of said church at Logan City, Utah, said marriage being what is called and known as a 'plural marriage,' and at that time permitted and sanctioned under certain conditions by the authorities of said church; that never at any time has there been any marriage of any kind whatever, other than that above mentioned, between plaintiff and defendant, solemnized by any person in any manner, or at all, and no relation whatever has at any time existed between plaintiff and defendant, other than that existing under and by virtue of the sanction of said church as hereinbefore stated." The plaintiff, upon the trial, was decreed a separate maintenance, and from that decree the defendant has appealed.

It appears that the defendant married Mary Ann Levi, his first wife, in 1853, in Utah, and while she was still living he married in 1861 Mary Roland, and

in 1863 also married Mary Ann Knell; that he cohabited with all of these women until the death of his first wife, which occurred in 1872; that after that time he continued to cohabit with his two plural wives, up to the time he married the plaintiff in the church temple at Logan, and from that time until the death of Mary Ann Knell, in 1899, he cohabited with the plaintiff and continued to maintain his previous relations under the former marriages; that the defendant and all of his said wives were, during the times before mentioned, members of the Mormon Church, and celestial or plural marriage, claimed to have been revealed to Joseph Smith as a prophet of God, was one of the essential tenets of their church; that at the date of the marriage of the plaintiff to the defendant said defendant was under indictment for unlawful cohabitation with his second and third wives, and in 1887 was convicted and served a term in the penitentiary for that crime.

From the abstract of the testimony it appears that the plaintiff testified: "He [the defendant] told me that he had two plural wives when I married him, but I was not acquainted with them. Riddle came with me to my home in Junction, in November, after I married him. I went to Mary Ann Knell's home the last week in November of that year. I believe I was introduced as Mrs. Langford. I was not introduced as Mrs. Riddle. I was known in Riddle's family as Mrs. Langford for the first two years of our marriage, and was so introduced by him. By defendant's request we tried to keep our marriage a secret, but it became known. I did not try to keep it a secret. I told it to my sons and others. I went by the name of Mrs. Langford, and I do to-day. He introduced me as Mrs. Riddle more than he did as Mrs. Langford. Within a year, or less time than that, Riddle moved me away from my home to their home (Mary Ann Riddle resided at the latter place), and of course it [the marriage] became known to his children. He avoided introducing me to anybody at that time—especially in some crowds where he

thought he had traitors. . . . For two years after we went to Manti, from 1891 on, we—Mary Ann Knell Riddle, myself, and Mr. Riddle—lived in the same house. We cooked and ate at the same table. The following two years I had a house of my own. I moved and Mary Ann Knell Riddle retained the place we first moved into. . . . Mr. Riddle lived with Mary Ann and me in turn—sometimes week about and sometimes days about. I think I was lived with a good deal the most, because his business was done with me. . . . I believe in the principle of plural marriage—the law of the Church. Mr. Riddle and I were members of the Church of Jesus Christ of Latter-Day Saints at the time of our marriage. I knew there was a law against plural marriages at that time. At the time of our marriage Mr. Riddle said: 'Our marriage is not to be a plural one. My first wife, my legal wife, is dead. I have two plural wives, and I want to make you my legal wife.' At the time Riddle and I were married he was 'on the underground' and told me that he had no legal wife, and that he dare not live with these two others, and was skipping from the 'deps.' [deputy United States marshals]. From the time he married me in the fall of 1886, until the following spring, he was 'on the skip—on the underground;' but he was with me a good deal of the time, hid up, and from the time of Mary Ann Knell's arrest he continued to live along with me until his own arrest—in August, 1887, or some time in the summer, at least, in August, after he came back from Arizona. I had no objection to Riddle having plural wives. About keeping our marriage a secret, Riddle said it wasn't wise to throw it around the country while he was 'on the underground.' He asked me to permit him to introduce me as Mrs. Langford, because he wanted to cover up the marriage. He said he would be prosecuted for it—for making things public at that time. . . . When he found somebody he felt safe with, you know, he thought that it was rather nice to introduce me, and make his brags how he courted me and married me

while he was running from the 'deps.,' and cohabiting
with his plural wives. The trial was in September or
October, 1887, and after that I was introduced as Mrs.
Riddle only a very few times, because, as Riddle said,
to kind of throw a blind—to blind the people. After
Riddle came out of the pen, he came right to me at
Provo. Riddle never told me that he cohabited with
Mary Ann Knell after he came out of the pen, but I
knew it. I knew he was cohabiting with Mary Ann
Knell after he came out of the pen, but didn't care.
He told me about taking Mary Ann Knell to the justice
of the peace and being married. He said they went
out in the dark, at the gate, and that the justice told
them to take hold of hands, and the ceremony was per-
formed, and that he got a scrap of paper for Mary Ann
Knell, so it would throw her out in the trial. The justice
gave her a paper that answered to throw Mary out, and
Riddle said the paper was given to her for that purpose.
He told me this when he did it. It was in January or
February, after we were married. [The paper referred
to was a certificate of marriage of the defendant and
Mary Ann Knell.] I kept our marriage under cover
as much as I could for five years, until 1891. Mr. Rid-
dle said he would be prosecuted if the marriage be-
came known before five years had expired. And it
was an understanding between us to keep things covered
up and quiet. . . . I was not with him at the time
of his trial, until he had served his sentence in the peni-
tentiary. Did not talk with him until he came out of
the penitentiary, when we had a conversation about his
being liable to go to the penitentiary for five years, and
when he told me he had married Mary Ann Knell, and
wanted it kept a secret, and still keep me under cover
for five years. He married Mary Ann Knell, unknown
to me or anybody, and said he done it to keep her from
testifying against him. Riddle also told me he didn't
think it would amount to much, and that it was wisdom
for me to keep under cover, and pass along, and be

26 Utah 18

quiet and peaceable. He wanted our marriage kept a secret for five years to keep him from going to the penitentiary."

The defendant testified: "Mary Ann Knell gave her consent for me to marry Caroline. I kept the marriage quiet for five years, and did not introduce her as Mrs. Riddle until after that time. Mary Ann Knell and Mary Caroline lived at Manti together, and I introduced Caroline as Mrs. Langford, and Mary Ann Knell as my wife. . . . I called Mary Ann Knell my wife before and after the death of my first wife, and sustained the relation of husband to Mary Ann Knell from the time I married her until 1872, when my first wife died. I married the plaintiff as a plural wife. I told President Crosby, at the time he gave me the recommend to marry the plaintiff, that I had one plural wife and my legal wife. . . . After I married Mary Ann Knell before Alphin, I lived with plaintiff whenever occasion called me there, from the time I married her until the time I left her last fall. I have always recognized plaintiff as one of my plural wives—might have called her, at times, my dear wife. She was, and she is, my wife; but she is a plural wife. . . . One of my reasons for marrying Mary Ann Knell was to keep her from testifying in the event of my arrest."

In the examination of the defendant by plaintiff's attorney, the following occurred: "Q. Why did you go through this form of marriage, if you considered that Mary Ann Knell was your legal wife before that time? [The marriage here referred to was the one in which the certificate of marriage, referred to in the plaintiff's testimony, was given.] A. If you will allow me, I will explain that according to my understanding. She was married as a plural wife in 1863, and lived as such up until that time. Q. Up until what time? A. Up to the 10th of May, 1885. Q. Now, you say that you lived with her as a plural wife up to 1885. What did you mean by saying that you held her out as your legal wife, and had that contract with her?

A. Well, I understood it this way: I had another wife, and we were married under church law. Mary Ann Roland had a dead husband, and I only married her for time. Q. Well, why did you state, a while ago— You said a while ago that you held her out after the death of your first wife as the legal wife, and took her there to take the place of the first wife; and now you say you lived with her as a plural wife after the death of your first wife. Why did you say that? A. I said that because I so understood it at that time. That was according to the understanding of that kind of a marriage at that time; and I held her out and lived with her principally and the children.'' The defendant also testified that Mary Ann Knell, upon the trial at which he was convicted for unlawful cohabitation, testified that she was his legal wife, and thereupon was excused from testifying further in the case.

Jesse W. Crosby, the president of the church stake from whom the defendant obtained a recommendation to marry the plaintiff in the Logan Temple, testified, in substance, that he asked the defendant how many wives he had, and that he said he had two, and that his legal or first wife was dead, and that he did not wish the contemplated marriage known; that if he should be apprehended on account of the marriage, and the case was brought to trial, his proposition would be that she (the plaintiff) was his legal wife, for the reason that his legal wife was dead. On cross-examination of this witness the following occurred: ''Q. He wanted it kept a secret? A. Yes, sir. Q. Did he say anything why he wanted it to be kept secret, if it was to be a legal marriage? A. My recollection was that he did. He gave the reason why that he had two wives, and that he did not want this known, to disturb his family relations at all. Q. He thought a marriage, after having two wives, and living with them right along, and raising families, might create some disturbance? A. Yes, sir. Q. I got that from your testimony. And he wanted under all of the circumstances, whatever they were, he wanted

this marriage kept secret? A. That was the under-
standing that I had. Q. Couldn't even trust his
Bishop? A. No, sir. Q. With the fact that he was
going to marry. You thought it was a plural marriage,
didn't you, as president of the stake? A. Well, I
wouldn't be positive in regard to my thoughts in regard
to that. Q. Did you, or didn't you, know that he had
been living with Mary Ann Knell up to that time as his
wife? A. I believe I answered that, Brother Thur-
man, that I did know. The Court: Yes, he said he
knew that he was living with both of them. Mr. Thur-
man: Well, I am asking particularly now about this
one. He only answered that he knew he had two wives.
The Court: Oh, and living with them. Mr. Thurman:
Now I am asking about the particular one that I have
named. Q. Now, he said, in effect, did he not, that if
it came to a pinch, or if it became necessary, or come
to a long pull, or a long count, or something of that kind,
he could claim this as his legal marriage? A. Yes,
sir. Q. That is what he said, wasn't it? A. Yes,
sir. The Court: That is, if he was indicted for poly-
gamy, you mean. A. Yes, sir.''

BASKIN, C. J., after stating the foregoing facts,
said:

The only contention in this case is whether, in re-
spect to the plaintiff and defendant, the legal status
of marriage arose · from the ceremony performed in
the Logan Temple. Appellant's counsel contend that it
did not, and in support of that contention claim:

1.   That Mary Ann Knell, under and by virtue of
the common law, was the legal wife of the defendant
at the time of his alleged marriage with the plaintiff,
and that the latter is therefore a plural wife.

There was no statute on the subject of marriage in
Utah until the passage by Congress of the Edmunds-
Tucker law, which went into effect on March 3,
1887. 24 Stat. 635, c. 397 [U. S. Comp. St. 1901, p.
3635]. In the absence of any such statute, the common

law on the subject of marriage was in force. For that reason counsel for appellant contend that the cohabitation of Mary Ann Knell and the appellant, and his declarations and acts respecting the same, after the death of his first wife and before his alleged marriage with the plaintiff, disclosed by the testimony, show that Mary Ann Knell, under the common law, was the legal wife of the appellant at the time of the alleged marriage. "At common law marriage is the voluntary union for life of one man and one woman, to the exclusion of all others." 2 Nelson, Div. and Sep., sec. 575; Roche v. Washington, 19 Ind. 57; Olson v. Peterson (Neb.), 50 N. W. 155; Henry v. Taylor, 93 N. W. 641-643; Hyde v. Hyde & Woodmansee, 1 Law Rep. Prob. Div. 130; In re Bethell, 38 Law Rep. Ch. Div. 220. "All of the authorities concur in the conclusion that marriage has it origin and foundation in a purely civil contract." 1 Bishop, Mar. and Div., sec. 37; Little v. Little, 13 Gray 266.

In the case of Maynard v. Hill, 125 U. S. 190, 210, 8 Sup. Ct. 723, 31 L. Ed. 654, 659, Mr. Justice Field, in the opinion, said: "It is also to be observed that, whilst marriage is often termed by text-writers and in decisions of courts a civil contract—generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization—it is something more than a mere contract. The consent of the parties is, of course, essential to its existence; but, when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released, upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities."

In Randall v. Krieger, 23 Wall. 137, 23 L. Ed. 124, 126, Mr. Justice Swayne said: "Marriage is an institution founded upon mutual consent. The consent

is a contract, but it is one *sui generis*. Its peculiarities are very marked. It supersedes all other contracts between the parties, and with certain exceptions it is inconsistent with the power to make any new ones. It may be entered into by persons under age of lawful majority. It can neither be cancelled nor altered at the will of the parties upon any new consideration. The public will and policy controls their will. . . . Perhaps the only element of a contract, in the ordinary acceptation of the term, that exists, is that the consent of the parties is necessary to create the relation.''

The legal status of marriage rests solely upon the basis of a civil contract, in which the contracting parties mutually consent and agree to be bound by the ''various obligations and liabilities'' which by operation of law arise from the relations of the contracting parties upon the consummation of the marriage. One of the essential obligations of a valid marriage contract is that which binds the parties to keep themselves separate and apart from all others, and cleave to each other during their joint lives. Therefore any contract in which the parties fail to consent and agree to so live together is void, and the legal status of marriage cannot arise therefrom.

In the case of Hyde v. Hyde, supra, it appears that the petitioner, Hyde, in 1853, at Salt Lake City, Utah, married Miss Hawkins. Both were members of the Mormon Church, and Brigham Young, president of the church, performed the marriage ceremony. They cohabited as man and wife in said city until 1856, when Hyde apostatized and went to England. Afterwards his wife was married to Woodmansee and Hyde instituted a suit for divorce in England, and alleged as a ground the adultery of his wife. Both Hyde and Miss Hawkins were single at the time they were married, and polygamy was a part of the Mormon doctrine, and was prevalent among the members of that church. Lord Penzance, before whom the case was tried, said: ''It is necessary to define what is meant by 'marriage.' In

Christendom it means the union of two people, who promise to live through life alone with one another. It does not mean the same thing in Utah, as a man is at liberty to marry as many women as he pleases. It would be extraordinary if a marriage in its essence polygamous should be treated as a good marriage in this country. Different incidents of minor importance attach to the contract of marriage in different countries in Christendom, but in all countries in Christendom the parties to that contract agree to cohabit with each other alone. It is inconsistent with marriage as understood in Christendom that the husband should have more than one wife." And he rejected the prayer of the complainant for that reason.

In re Bethell, supra, it appears that Bethell, an English subject, married Tepoo, who was a member of a semi-barbarous tribe of the Baralongs. Polygamy prevailed among the members of the tribe, and the marriage was consummated in accordance with the custom, which is as follows: "When the consent of the parents has been obtained, the bridegroom slaughters a sheep, a buck, an ox, or a cow. The head of the animal is taken to the bride's parents, as also the hide, which is cleaned and softened. They are then considered married, and after the birth of the first child the number of the cattle previously agreed upon is handed over to the wife's parents." The doctrine of the case of Hyde v. Hyde was approved and followed, and Stirling, J., after quoting from that case and from the opinion of Lord Brougham in the celebrated case of Warrender v. Warrender, 2 Cl. & F. 532, 533, in which the same doctrine was held, said: "I conceive that, having regard to these authorities, I am bound to hold that a union formed between a man and a woman in a foreign country, although it may there bear the name of a marriage, and the parties to it may there be designated husband and wife, is not a valid marriage according to the law of England, unless it is formed on the same basis as marriage throughout Christendom, and be in its essence

'the voluntary union for life of one man and one woman, to the exclusion of all others.' "

We are of the opinion that, notwithstanding celestial or plural marriage is one of the essential tenets of the Mormon Church, the legal status of marriage exists between parties who, in Utah, before the enactment of any statute upon the subject, through members of that church, have made a contract of marriage in which they mutually agree to assume and observe the legal obligations of that relation, and in pursuance of that agreement openly cohabit as man and wife and hold themselves out to the public as such; but, in the absence of such an agreement, the legal status of marriage cannot arise. This brings us to the consideration of whether it is shown by the evidence that the appellant and Mary Ann Knell entered into a legal contract of marriage. During the life of the appellant's first wife, and after her death, up to the 10th of May, 1885, the date at which the ceremony before a justice is alleged to have been performed, the appellant himself testified that he lived with Mary Ann Knell as his plural wife, and that both before and after the death of his first wife he introduced Mary Ann Knell as his wife. It also appears that he continued to cohabit with his first and second plural wives, after the death of his first wife, until the death of Mary Ann Knell in 1899. It is evident from these facts that no legal contract of marriage between the appellant and Mary Ann Knell was entered into previous to May 10, 1885, or that at common law their status was that of husband and wife.

2. It is further contended by appellant that, prior to his marriage with the plaintiff, he, on the 10th day of May, 1885, entered into a formal marriage before a justice of the peace with Mary Ann Knell.

While it is clear that there was a formal ceremony of marriage performed by the justice of the peace, we are not satisfied that it took place before the alleged marriage with plaintiff, or that the parties really

intended thereby to change their plural relations, but simply to disqualify Mary Ann Knell- as a witness. The appellant in his testimony states that one of his reasons for marrying Mary Ann Knell was to keep her from testifying in the event of his arrest. The plaintiff testified that the appellant, at the time she married him, told her that he had two plural wives, and in another connection that he told her about taking Mary Ann Knell to the justice of the peace and being married; that he said he got a scrap of paper for Mary Ann Knell, so that it would throw her out in the trial, and that it answered that purpose.

In view of the foregoing testimony, and the fact that at the time the justice performed the ceremony Mary Ann Knell and Mary Roland were his plural wives, and that after the ceremony he continued to cohabit with both as his wives, as he had previously done, it is clear that the ceremony before the justice of the peace was a ruse resorted to for the purpose of disqualifying Mary Ann Knell as a witness, and not with the intention of disturbing his polygamic relations then existing, and refutes the idea that the parties intended to consummate a monogamic marriage.

3. The appellant also contends that he married the plaintiff as a plural wife.

It appears from the evidence that both the appellant and the plaintiff were members of the Mormon Church; that the plaintiff, at the time of her alleged marriage, was aware of the fact that the appellant had two wives; that the marriage ceremony was performed in the Logan Temple on the 9th day of November; and that the plaintiff, in the last week of the same month, went to the home of Mary Ann Knell, and was there introduced as Mrs. Langford, and within a year or less from that time was moved by appellant to the home of Mary Ann Knell, and from thence for years these women lived together and cohabited with the appellant as his wives. The appellant testified that he married the plaintiff as a plural wife. In this he is corroborated

by the facts just stated.   In view of the facts disclosed by the evidence, and that one of the essential tenets of the church to which the parties belonged was celestial or plural marriage, and that there is not any evidence showing the form of the ceremony performed in the Logan Temple, there is not the least probability that it was a monogamous marriage, uniting the contracting parties in wedlock for life, to the exclusion of all others, or that the parties mentally agreed that the appellant should observe or be bound by the legal obligations of a monogamic marriage.

We are clearly of the opinion that none of the three women mentioned became the legal wife of the appellant, but that their relations to him were those of plural wives, and he did not, therefore, incur the legal obligations of marriage in respect to either of them.   We are, however, of the opinion that he became, and still is, morally bound, not only, if able to do so, to support his plural wives but also to support and educate the children of the plural wives begotten by him; but, as secular courts are powerless to enforce any but legal obligations, the judgment must be reversed.

It is therefore ordered that the judgment be reversed, with costs, and the case remanded, with directions to the court below to dismiss the complaint.

BARTCH and McCARTY, JJ., concur.