## ROBERT S. REAVES v. FRANCES A. REAVES.

(Filed June 7, 1905)

1. MARRIAGE, COMMON LAW—Valid, When. Where the facts show that on the 25th day of June, 1890, in the Territory of Oklahoma, parties competent to contract marriage entered into an agreement with each other that they would be husband and wife to each other, and immediately began living together and cohabiting with each other as husband and wife, and holding out to the world that the relation of husband and wife existed, the question of whether or not a common law marriage existed by such acts would be governed by the statutes of Nebraska, which were in force in this territory at that time, and the facts above stated would constitute a common law marriage under the laws of Nebraska notwithstanding the fact that the same was not solemnized in accordance with the provisions of the statute. or that no officer authorized to consummate marriage, or any minister of gospel performed a ceremony of marriage.

2. SAME—Definition and Requisites. Marriage in the legal sense is a civil contract and it is not indispensible that a clergyman should be present to authorize and confirm the contract in order to give validity to the marriage.

3. SAME—Statutes Relating to, Construed How. Statutes regulating marriage are usually directory merely, and when such statutes do not expressly prohibit or forbid other forms of marriages, a common law marriage, consummated in accordance with the rules of the common law, is valid.

4. APPEAL—Finding of Fact, Reviewed, When. Where a case is submitted to the court and a jury waived, the finding of fact by the court will not be disturbed where there is competent evidence which reasonably tends to support the findings.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before Jno. H. Burford, Trial Judge.*

*George W. Buckner* and *Cotteral & Hornor,* for plaintiff in error.

*Dale & Bierer* and *Adelbert Hughes,* for defendant in error.

## STATEMENT OF FACTS.

This case originally arose in the probate court of Logan County, on an application by the defendant in error, Frances A. Reaves, for letters of administration on the estate of H. H. Reaves, deceased, as his wife, and objections thereto by Robert S. Reaves, a brother of the deceased, on the grounds that she was not his wife. A decision was rendered by the probate court, granting letters of administration to Frances A. Reaves. From that decision an appeal was taken to the district court. A jury was waived and the cause tried to the court. The decision of the probate court was affirmed, and letters of administration granted to Frances A. Reaves. Motion for new trial was filed within the statutory time, overruled by the court, exceptions saved, and the cause is brought here for review.

Opinion of the court by

IRWIN, J.: In this case, at the request of the attorneys for the plaintiff in error, the court made certain findings of facts, which are as follows:

"1st. On and prior to the 25th day of June, 1890, the deceased H. H. Reaves was an unmarried man, over the age of twenty-one years, and able and competent to contract marriage and a resident of the city of Guthrie, Oklahoma Territory.

"2nd. On and prior to the 25th day of June, 1890, the appellee, Frances A. Reaves, was a widow, unmarried, over the age of 18 years and competent to contract marriage, and was a resident of Guthrie, Oklahoma Territory.

"On the 25th day of June, 1890, H. H. Reaves and Frances A. Reaves were each competent to contract marriage, and did, at the said time, in the city of Guthrie, agree with

each other that they would be husband and wife to each other, and did immediately begin living together and cohabiting together as married persons.

"4th. That said marriage relations were entered into with the mutual consent of both parties, and that they immediately assumed all of the marital rights and obligations, and uninterruptedly exercised the same until the death of H. H. Reaves.

"5th. That the said marriage was entered into by the said parties in good faith, they each believing that no form of ceremony was essential to the validity of their marriage, and their subsequent cohabitation and domestic relations was the result of said marriage.

"6th. That no marriage ceremony was ever performed, and no witness was present when said marriage agreement and relations were contracted.

"7th. That from the 25th day of June, 1890, to the death of H. H. Reaves, he and the said Frances A. Reaves live together in the city of Guthrie and sustained the relations of husband and wife, and held themselves out to the world and to the public as husband and wife, as well as to their friends and relations.

"8th. That for a period of over ten years, and up to the death of H. H. Reaves, the said H. H. Reaves acknowledged and recognized the said Frances A. Reaves as his wife. He wrote numerous letters to her at various times, and addressed said letters to her through the mails, as his wife.

"9th. That the said H. H. Reaves, on several occasions during his life time, executed mortgages upon real estate held jointly by him and his brother Robert S. Reaves, and in said mortgages, H. H. Reaves and Frances A. Reaves were designated as husband and wife, and she signed, acknowledged and executed said instruments as the wife of H. H. Reaves and the said Robert S. Reaves joined in the execution of said instruments, knowing said facts.

"10th.   That H. H. Reaves treated Frances A. Reaves as his wife, introduced her to his friends and acquaintances as his wife, and when traveling, went with her, went to hotels and registered as H. H. Reaves and wife.

"11th.   That during the time said parties lived together as husband and wife, he partially supported and educated her children by a former marriage, and allowed them to live with him as one family.

"12th.   That H. H. Reaves died intestate in the county of Logan, Oklahoma Territory, on the 9th day of May, 1902, leaving property subject to administration, and the said Frances A. Reaves is a competent person to be appointed as said administratrix of said estate."

Under this finding of facts it is apparent that on the 25th day of June, 1890, the defendant in error, Frances A. Reaves, and the deceased H. H. Reaves, both being parties capable of performing a marriage contract, entered into an agreement whereby they were to be husband and wife to each other, and did immediately begin living together and cohabiting with each other as married persons.

The first contention of plaintiff in error in this case is that the evidence failed to establish a marriage as set forth in the finding of facts.   We have examined the case made, and the evidence therein contained as having been taken before the district court, and we are not prepared to say that there is not evidence which reasonably tends to support the finding of facts of the district court; and under the well recognized and oft repeated rule of this court, where this is the fact, this court will not disturb a finding of facts.

But it is contended by plaintiff in error that there can be no such thing as a common law marriage under the laws of this Territory, without a celebration in the manner pro-

vided by statute. That when the statute points out the manner in which marriages shall be solemnized, that it precludes the possibility of any other marriage being legal. But we think that this question of a common law marriage does not come under the provisions of the laws of this Territory, but rather under the provisions of the laws of Nebraska, as the organic act of this Territory, chapter 11, approved by congress May 7, 1890, among other things, placed in operation in this Territory the act of Nebraska with reference to marriages, until the next meeting of the territorial legislature. The meeting of the first territorial legislature was in 1890. The agreement of marriage between the parties in this case was made at and prior to June 25, 1890, this being within that period wherein by the act of congress, the laws of Nebraska were in force. Section 1, of the laws of Nebraska in regard to marriage, reads as follows:

"In law, marriage is considered as a civil contract, to which the consent of the parties capable of contracting is essential."

Section 4 of this act provides for the qualifications of the parties and the manner of the performance of the marriage ceremony, but so far as we can ascertain, this act nowhere provided that in the event no ceremony shall be performed the marriage shall be absolutely void. It is simply the evidence of marriage. This statute has been fully considered by the supreme court of that state.

In *Reed v. Fletcher,* 34 Nebraska, 434, the court says:

"It is regarded as settled by judicial authority, throughout the United States, that marriage, in the legal sense, is a civil contract; that it is not indispensible that a clergyman should be present to authorize and confirm the contract, in order to give validity to the marriage."

In *Haggin v. Haggin,* 35 Nebraska, 375, it appears that the defendant took the plaintiff into the state of Kansas, before a person who pretended to be but was not a qualified clergyman, and had a fraudulent ceremony of marriage performed. The court in holding this good as a common law marriage, said:

"In the absence of allegations to the contrary, the laws of Kansas, in relation to marriage, will be presumed to be the same as the laws of this state. The practice of Great Britain, under, the ecclesiastical laws or rules, appears to be the announcement, in a particular church, of the intended marriage, the purpose being to give all persons who may be opposed to the marriage, an opportunity to present themselves and offer their objections, before it is too late. The principal object is to prevent ill advised and clandestine marriages. The statute requiring license is designed to take the place of publication of banns, and the laws as to both are directory and the failure to observe them does not affect the validity of the marriage. The marriage is therefore valid, and the defendant in error is the wife of plaintiff in error, and she cannot recover damages for a void marriage."

In *Bailey v. State,* 36 Neb. 808, in passing upon the question of a common law marriage which was contracted in the state of Iowa, the court holds that the presumption is that the laws of Iowa are the same as the laws of Nebraska, and the court used this language:

"Wherever treated as a civil contract, it is sufficient to constitute a marriage that the minds of the parties meet in consent at the same time. No particular form of expresson is required."

But it is contended that the court admitted improper testimony in support of the agreement between the defendant in error, Frances A. Reaves, and H. H. Reaves, deceased.

That is, in permitting the defendant in error to testify to statements made to her by the deceased, claiming that such testimony is in violation of the provisions of the statute which provides that no person shall be allowed to testify in his own behalf to any transaction or communication had personally by such party with a deceased person, when the adverse party is the executor, administrator, heir at law, next of kin, surviving partner, or assignee of such deceased person, where they have acquired title to the cause of action immediately from such deceased person, but we think that if there was any force in this contention that it has been lost, for the reason that the record does not disclose that the objection was properly saved in the court below. We have examined the record containing the testimony, and we find that nowhere during the taking of such testimony was the objection raised to the competency of the witness. It is true, certain objections were made to certain questions asked of her, but each time it was placed upon the ground that the question itself was incompetent, irrelevant, or immaterial, or as to other questions that they were not the best evidence. She was sworn as a witness, and testified without any objection on the part of counsel for plaintiff in error as to her competency to testify. Had they desired to save the point and assign it as error, they should have done so at the time of the trial. Not having done so, under the doctrine laid down in *Boyd v. Bryan,* 11 Ok. 56, and *Territory ex rel. W. R. Taylor v. Caffrey,* 8 Okla. 193, it is now too late to raise that objection.

We find in the record at the bottom of page 41, this question and answer:

"Q.  I will ask you to state what each party said at that time with reference to the matter, Mrs. Reaves, what was said by him, and what was said by you?

"A.   Well, Mr. Reaves told me he wanted me to live with him, to take care of him and be his wife."

Now, so far as the record shows, no objection was made to this question or answer when given.   It is true, that at the close of the examination of Mrs. Reaves, the counsel for plaintiff in error "moved to strike out from this testimony, that portion of the testimony of the witness, which put words concerning this contract, into the mouth of H. H. Reaves, under the ordinary rule that Mr. Reaves is deceased."   Now this motion was not based upon any objection made during the taking of the testimony, and it seems to us is not enough to save the point attempted to be saved by this assignment of error.   It is apparent that this motion was not to strike out all her testimony as to conversations and transactions with the deceased, but it was to strike out certain portions described by counsel as that part which put words into the mouth of a dead man.   This would be entirely too indefinite and too uncertain for this court to sustain.   If they had desired to avail themselves of this error, it would have been their duty to have specifically raised the objection, basing it upon the incompetency of the witness at the time of the taking of the testimony, or if this was not done, at the close of the testimony if they desired to move to strike out a portion of her testimony, they should have pointed out definitely and clearly to the court what portion of that testimony they desired to have stricken out.   They having failed to pursue either of these courses, in our judgment this error, if error at all, is not available.

Complaint is also made that the question of a common law marriage, or the relations sustained by the parties, was not sustained by sufficient evidence.   Now we have examined

the record, and in our opinion there was sufficient competent evidence to sustain the finding of facts made by the court without considering the testimony of the defendant in error at all. Now as to the competency of this witness, it is not necessary for the reasons herein expressed to determine whether or not she was a competent or incompetent witness as to declarations made to her by the deceased. This objection, if objection at all, was to the witness, and not to the subject-matter of her testimony. We take it that where the validity of a marriage is sought to be established that it is always competent to prove the declarations of the parties, for the purpose of showing the character of their intercourse. Where a man and woman cohabit together, and the question to be decided is whether the character of her intercourse with him is matrimonial or meretricious, the declarations of the parties during such intercourse, the fact of their appearing in public with each other as man and wife, of their visiting in respectable families, and of their being treated by their acquaintances and spoken of by them as sustaining that relation to each other, constitutes a part of the *res gestae,* showing the character of that intercourse to be matrimonial or virtuous. This was so held in the case of *In re Taylor,* reported in the 4 N. Y. Chancery Reports, 837, 9 Paige's Chancery Reports, 611.

Counsel for plaintiff in error also complains that the court committed error in refusing to allow the witness R. S. Reaves to testify to conversations had with deceased, H. H. Reaves. We have examined the questions asked to which objections were sustained, and we think the objections should have been sustained, because the questions were too general and were not confined to conversations had with him concern-

ing his marriage relations with Frances A. Reaves. The question was: "Q. Did you ever have any conversation with H. H. Reaves concerning the relation he bore to Frances A. Reaves?" And the other question was: "Did he make any statement to you concernng that matter?" It was no doubt on account of the general nature of the questions that the trial judge sustained the objection; and on an examination of the entire record we are of the opinion that even if this was error, it was not such error as would naturally change the issues in the case, because we think the finding of the court is based upon other competent, credible evidence, sufficient to sustain the finding. In this case there is ample evidence to support the finding of the trial judge. The evidence of marriage is not based solely upon the testimony of the defendant in error. The testimony of Frank Greer, a next door neighbor for seven years, as to the conduct and deportment of the parties; the record made in the family bible; the fact of the execution of mortgages upon real estate in which the plaintiff in error joined with full knowledge of the relation of the parties; the correspondence, letters written by deceased to defendant in error in which he addresses her as his wife, or at other times as Mrs. H. H. Reaves—all of these facts were competent, and properly in evidence; and if we are to eliminate from our consideration every statement as to the declarations of the deceased, objected to by plaintiff in error, there is still ample and sufficient evidence to warrant the finding of the court as to the facts. It is apparent in the evidence in this case that at one time these parties executed deeds of conveyance in which they signed as husband and wife and this fact was known at the time to the plaintiff in error, R. S. Reaves, as he was consulted about the matter, and joined

in the conveyance, which was a mortgage given by Reaves Brothers, and Frances A. Reaves, to Felix Adler, and was signed H. H. Reaves, and Frances A. Reaves, husband and wife, and R. S. Reaves, a single man. Therefore, we think that as the record contains competent evidence other than the statements testified to by defendant in error as having been made by the deceased H. H. Reaves, it is immaterial whether it was error for the court to permit these statements, or to exclude the statements made to R. S. Reaves, or not. The main question to be determined in this case is whether the facts as set forth in the finding of facts by the court are sufficient to constitute a common law marriage under the laws of Nebraska. But it is contended by counsel for plaintiff in error that the decisions of the Nebraska supreme court cited in support of the contentions of defendant in error upon this point are not to be considered here, because they were decisions rendered long after the statutes of Nebraska ceased to be in force in this Territory, by virtue of the organic act. It is true that where a statute is adopted by the legislature of this Territory, only such decisions of the supreme court of that state construing that statutes as were in force at the time of its adoption are adopted with the statute, but it is nevertheless true that any decision of the supreme court of a state construing a statute of that state, where the construction is in consideration in the courts of this Territory, are proper subjects to look for light in determining the proper construction to be placed upon such statute. These decisions of the supreme court of Nebraska construing this statute are proper to be considered by this court in determining what is the proper construction of that statute.

The defendant in error contends that the marriage held by this court to exist is a good and valid marriage. It was made and entered into by agreement of the parties on June 25, 1890, to be and become a marriage *per verba de prasenti.* The plaintiff in error contends that an informal or common law marriage could not, at that time, be executed within the jurisdiction of this court. That is the issue, and the only issue to be tried in this case. The history of the law of marriage in this country traces its origin back to the ancient canon law, which consisted of the decrees of the various Popes, and was the basis of the matrimonial law in England, and has been recognized there ever since the establishment of Christianity in the year six hundred and five. No ceremony or religious sacrament was required by this law, which was regarded in England as the common law of marriages. This canon law was changed by the decree of the council of Trent in fifteen sixty-three, which declared void all marriages not solemnized by a parish priest in the presence of witnesses, but this decree was rejected, and not accepted as a part of the law of England. The common law was therefore in operation in England until the passage of Lord Hardwicke's act in 1753, regulating the license and solemnization of marriage in that country. The canon law continued, even after the marriage act, to be regarded as the law of marriage in England, until 1843, when in the case of *Reg. v. Mills,* 10 Cl & F. 534, it was held, before the House of Lords, that a common law marriage was void, by reason of the marriage act. This case has since been largely broken down, and has been expressly rejected by the courts of Canada. The canon and civil laws as administered in the ecclesiastical courts of

England, were brought over with our ancestors, and became a part of the common law of our country.

In *Hallett et al. v. Collins,* 10 How. 174, the court said:

"Whether such marriage was sufficient by the common law in England, previous to the marriage act, has been disputed of late years, in that country, though never doubted here." (See the case of *The Queen v. Mills,* 10 Cl & F. 534).

"On the continent clandestine marriages, although they subjected the parties to the censures of the church, were not only held valid by the civil and canon law, but were pronounced by the Council of Trent to be *vera matrimonia.* But a different rule was established for the future by that council, in their decree of Novvember 11th, 1563. This decree makes null and void every marrage not celebrated before the parish or other priest, or by license of the ordinary, and before two or three witnesses.

"But it was not within the power of an ecclesiastical decree, *proprio vigore,* to affect the status or civil relations of persons. These could only be affected by the supreme civil power. The church might punish, by her censures, those who disregarded her ordinances, but until the decree of the council was adopted, and confirmed by the civil power, the offspring of a clandestine marriage, which was ecclesiastically void, would be held as canonically legitimate."

In *Crump v. Morgan,* 40 Am. Dec. 447, the court said:

"It is a mistake to say that the canon and civil laws, as administered in the ecclesiastical courts of England, are not parts of the common law. Judge Blackstone, following Lord Hale, classes them among the unwritten laws of England and as parts of the common law, which by custom has been adopted and has its own peculiar jurisdiction." (1st Black. Com. 79; Hale's History of Laws, 27-32.)

The canon and civil laws as they were administered in England were brought here by the early settlers of this coun-

try and were regarded by them as parts of the common law, and have been adopted and used in all cases to which they were applicable, and whenever there have been conditions existing to call for their use. When it is conceded that these laws were a part of the common law of England, and were brought to this country by our ancestors, then it must follow that these laws have become and are now a part of the laws of Oklahoma. At least this was the opinion of the supreme court of this Territroy in the case of *McKinnon v. Wynne,* 1 Okla., 327. In the opinion in that case, the court said:

"It necessarily follows on principle, that when people from all parts of the United States, on the 22nd day of April, 1889, settled the country known as Oklahoma, built cities, towns and villages, and began to carry on trade and commerce in all the various branches, they brought into Oklahoma, with them, the established principles and rules of the common law as recognized and promulgated by the American courts and as it existed when imported into this country by our early settlers and unmodified by American or English statutes."

As before stated in this opinion, the general rule is that statutes which direct that a license must be issued and procured, that only certain persons shall perform the ceremony, that a certain number of witnesses shall be present, and that a certificate of the marriage shall be signed, returned and recorded, and that persons violating the conditions shall be guilty of a criminal offense, are directory merely, being addressed to persons in authority to secure publicity and a record of marriages, and will in no wise affect the validity of the marriage contract unless they contain an express pro-

vision to that effect. They simply provide the evidence of the marriage.

In *Meisler v. Moore*, 96 U. S. 76, the supreme court of the United States makes use of the following language:

"The learned judge of the circuit court instructed the jury, that, if neither a minister nor a magistrate was present at the alleged marriage of William A. Mowry and the daughter of the Indian Pero, the marriage was invalid under the Michigan statutes, and this instruction is now alleged to have been erroneous. It certainly withdrew from the consideration of the jury all evidence, if any there was, of informal marriage by contract, *per verba de praesenti*. That such a contract constitutes a marriage at common law, there can be no doubt, in view of the adjudication made in this country, from its earliest settlement to the present day. Marriage is elsewhere regarded as a civil contract. Statutes in many of the states, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence, they are not within the principle, that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common law right; but there is always a presumption that the legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have

usually held a marriage good at common law, to be good notwithstanding the statutes, unless they contain express words of nullity. This is the conclusion reached by Mr. Bishop, after an examination of the authorities. (Bishop, Mar. & Div., sec. 283 and notes.) We do not propose to examine in detail the numerous decisions that have been made by the state courts. In many of the states, enactments exist very similar to the Michigan statute, but their object has manifestly been, not to declare what shall be requisite to the validity of a marriage, but to provide a legitimate mode of solemnizing it. They speak of the celebration of its rite rather than of its validity, and they address themselves principally to the functionaries they authorize to perform the ceremony. In most cases, the leading purpose is to secure a registration of marriages, and evidence by which marriages may be proved; for example, by certificate of a clergyman or magistrate, or by an exemplification of the registry. In a small number of the states, it must be admitted, such statutes have been construed as denying validity to marriages not formed according to statutory directions. Notably has this been so in North Carolina and in Tennessee, where the statute of North Carolina was in force. But the statute contained a provision, declaring null and void all marriages solemnized as directed, without a license first had. So, in Massachusetts, it was early decided that a statute very like the Michigan statute rendered illegal a marriage which would have been good at common law, but which was not entered into in the manner directed by the written law. *Milford v. Worcester,* 7 Mass. 48. It may well be doubted, however, whether such is now the law in that state. In *Parton v. Henry,* 1 Gray (Mass.) 119 where the question was whether the marriage of a girl only thirteen years old, married without parental consent was a valid marriage (the statute prohibiting clergymen and magistrates from solemnizing marriages of females under eighteen without the consent of parent or guardian), the court held it good and binding, notwithstanding the statute.

In speaking of the effect of statutes, regulating marriage, including the Massachusetts statute, (which, as we have said, contained all the provisions of the Michigan one) the court said : 'The effect of these and similar statutes is not to render such marriages, when duly solemnized, void, although 'the statute provisions have not been complied with. They are intended as a directory only on ministers and magistrates, and to prevent as far as possible, by penalties on them, the solemnization of marriages, when the prescribed conditions and formalities have not been fulfilled. But, in the absence of any provision, declaring marriages not celebrated in a prescribed manner, or between parties of certain ages, absolutely void, it is held that all marriages regularly made, according to the common law are valid and binding, though had in violation of the specific regulations imposed by the statutes.' There are two or three other states in which decisions have been made like that in 7th Massachusetts."

In 2nd Greenleaf on Evidence, the author lays down this rule.

"Though in most, if not all, of the United States there are statutes regulating the celebration of marriage rights, and inflicting penalties on all who disobey the regulations, yet it is generally considered, that, in the absence of any positive statute declaring that all marriages not celebrated in a prescribed manner shall be void, or that none but certain magistrates or ministers shall solemnize a marriage, any marriage regularly made according to the common law, without observing the statute regulations, would still be a valid marriage."

In *Maryland v. Baldwin,* 112 U. S. 494, the court said :

"As the case must, for this error, go back for a new trial, it is proper to say that, by the law of Pennsylvania, where, if at all, the parties were married, a marriage is a civil contract, and may be made *per verba de praesenti,* that is, by words in the present tense, without attending ceremonies, religious or

civil. Such is also the law of many other states, in the absence of statutory regulation. It is the doctrine of the common law. But where no such ceremonies are required and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties, as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills , and other formal instruments. From such recognition the reputation will obtain of being married among friends, associates, and acquaintances, which is of itself evidence of , a · persuasive character. Without it, the existence of the marriage will always be an uncertainty; and the charge of the court should direct the jury to its necessity, in the absence of statutory regulations on the subject. Otherwise, the jury will be without any guide in their deliberations."

In *Matthewson v. Felix Iron Foundry Company*, 20 Federal, 281, the court said:

"At common law, as held in this country, and until recently, it would seem, as generally understood in England, persons of suitable age might, by words of present consent, contract a valid marriage without the presence and intervention of a minister, and without any particular form of solemnization. A statute may, of course, take away this common law right, but this is not to be presumed. The right is not conferred by statute but exists independent of it, and therefore it is held the rule does not apply that when a statute directs a thing to be done in a particular way, it is void if done in any other way. The construction usually adopted is that when the statute regulating marriage is directory merely, when it does not expressly forbid other marriage con-

tracts, a marriage *per verba de praesenti,* or at common law, is good."

To the same effect are the following authorities: 2 Green, Ev. Sec. 460; Kent's Com., 51; Reeves on Dom. Relations, 247 *Bynon v. State,* 117 Ala. 80: *Jones,* 28 Ark. 19; *Hargroves v. Thompson,* 31 Miss. 211; *Hynes v. McDermott,* 91 N. Y. 451: *Carmichael v. State,* 12 Ohio State, 553.

Hence we take it that the doctrine is well established that the common law of England as modified by the statutes of this country is in force in the Territory of Oklahoma, and that the conditions that exist as shown by the statement of facts found by the district court constitute a common law marriage, and consequently is a valid marriage in the Territory of Oklahoma. This doctrine we think is more in accord with equity, justice, and good morals than to adopt a rule which might work irreparable injury and hold illegitimate the offspring of parties who were conscious of no violation of the law.

In the case at bar, it is apparent from the evidence contained in the record that this defendant in error lived and cohabited with the deceased, H. H. Reaves, as his wife and was so recognized by him, so introduced to his neighbors and friends; that she was recognized by their associates as his wife, that she signed deeds with the knowledge and consent of this country is in force in the Territory of Oklahoma, and that she performed all her duties as a wife for many years prior to his death. And while some indirect attempts are made to cast reflections upon her as to her moral character, we think it unnecessary for the court to discuss this aspect of the case, because from the evidence of the entire record we are forced to the conclusion that in the scale of morals, as

between plaintiff and defendant the honors were at least easy, and whatever the moral character of Frances A. Reaves was at the time she entered into the marriage relations with H. H. Reaves, it was well known to all the parties concerned and if she was morally bad, they were, if anything, worse. What she was was simply the legitimate product of the business they were engaged in, and it comes with bad grace for them, for the purposes of this law suit, or to gain some mercenary advantage to point the finger of scorn at her. It is simply a case of the pot seeking to call the kettle black.

We think the court from all the evidence in this record was fully justified in finding that a common law marriage existed, and that she was entitled to administer upon the estate of H. H. Reaves, deceased. Finding no error in the record, the case is affirmed at the costs of plaintiff in error.

Burford, C. J., who presided in the court below, not sitting; all the other Justices concurring.