*In re* LOVE'S ESTATE.
LOVE v. LOVE.

No. 3607.   Opinion Filed July 14, 1914.

(142 Pac. 305.)

1.   MARRIAGE — "Common-Law Marriage." A common-law marriage exists where competent parties agree to be and become immediately man and wife, and pursuant thereto enter into and maintain thereafter the marriage relation.

2.   SAME—Requisites—Validity. Marriage, in the legal sense, is a civil contract, and it is not indispensable that a clergyman should be present to authorize and confirm the contract in order to give validity to the marriage. .

3.  **SAME—Common-Law Marriage.** Statutes regulating marriage are usually directory merely, and, when such statutes do not expressly prohibit or forbid other forms of marriages, a common-law marriage, consummated in accordance with the rules of the common law, is valid.

4.  **SAME—Noncompliance with Statutes.** The general rule is that statutes which direct that a license must be issued and procured, that only certain persons shall perform the ceremony, that a certain number of witnesses shall be present, and that a certificate of the marriage shall be signed, returned, and recorded, and that persons violating the conditions shall be guilty of a criminal offense, are directory merely, being addressed to persons in authority to secure publicity and a record of marriage, and will in no wise affect the validity of the marriage contract, unless they contain an express provision to that effect.

5.  **SAME—Common-Law Marriage—Validity.** A common-law marriage is valid in this state.

(Syllabus by Brewer, C.)

*Error from District Court, Blaine County;*
*James R. Tolbert, Judge.*

Petition in the county court by W. S. Love, praying that letters of administration issued to Emma Love in the matter of the estate of Albert W. Love, deceased, be vacated, and that he be appointed administrator. From an adjudication of the district court on appeal that Emma Love was not entitled to the letters of administration, she brings error. Reversed and remanded.

*J. P. Wishard,* for plaintiff in error.

*Seymour Foose, Robert A. Lowry,* and *R. C. Brown,* for defendant in error.

Opinion by BREWER, C. The record in this case presents a single question: Is a common-law marriage valid in this state?

Emma Love was granted letters of administration upon the estate of Albert W. Love, as his widow surviving him. W. S. Love, father of the deceased, filed a petition asking that the letters of administration issued to Emma Love be vacated, and that he be appointed as administrator of his son's estate. Upon a hearing in the county court, it was found that Emma Love was the common-law wife of the deceased; that the relation had

been entered into by the parties in such a way as to constitute a valid marriage at the common law; and the court held, as a matter of law, that such a marriage was valid in this state. On appeal to the district court, the same findings of fact were made, but the court held that, under the present state of statutory law of this state, a common-law marriage is invalid; and that therefore Emma Love was not entitled to letters of administration on the estate of the deceased.

The Territorial Supreme Court in *Reaves v. Reaves,* 15 Okla. 240, 82 Pac. 490, 2 L. R. A. (N. S.) 353, sustained a common-law marriage under the law of the territory as it then existed, saying in the syllabus:

"Marriage, in the legal sense, is a civil contract, and it is not indispensable that a clergyman should be present to authorize and confirm the contract in order to give validity to the marriage. Statutes regulating marriage are usually directory merely, and, when such statutes do not expressly prohibit or forbid other forms of marriages, a common-law marriage, consummated in accordance with the rules of the common law, is valid."

But, at the time of this decision, the law of Nebraska, which had been put temporarily in force by the Organic Act, relating to the question of marriage, was in force, and that decision followed and relied upon the construction of the statute law declared by the Nebraska Supreme Court; but the court in that opinion took occasion to make an extensive study of the question, saying in the opinion:

"As before stated in this opinion, the general rule is that statutes which direct that a license must be issued and procured, that only certain persons shall perform the ceremony, that a certain number of witnesses shall be present, and that a certificate of the marriage shall be signed, returned, and recorded, and that persons violating the conditions shall be guilty of a criminal offense, are directory merely, being addressed to persons in authority to secure publicity and a record of marriages, and will in no wise affect the validity of the marriage contract unless they contain an express provision to that effect. They simply provide the evidence of the marriage."

But the statute of Oklahoma in force at the time of the marriage involved here differs from that of Nebraska, with which

the. Reaves case was concerned, and therefore it becomes neces-- sary to again examine the question.

This difference in the statutory law led this court, in the case of *Clark et al. v. Barney,* 24 Okla. 455, 103 Pac. 598, to propound in the syllabus the question:

"Quaere. Is a marriage under the common law, without a celebration or solemnization in manner provided by our statute, permissible under the laws as now in force in this jurisdiction?"

And this question has not heretofore been squarely answered in this court.

Comp. Laws 1909, section 4222 (Rev. Laws 1910, sec. 3886), follows:

"No person shall enter into or contract the marriage relation, nor shall any person perform or solemnize the ceremony of any marriage in this state without a license being first issued by the judge or clerk of the county court, of some county in this state, authorizing the marriage between the persons named in such license."

Section 4219, Comp. Laws 1909 (Rev. Laws 1910, sec. 3883), defines marriage as:

"A personal relation arising out of a civil contract to which the consent of parties legally competent of contracting and entering into it is necessary, and the marriage relation shall only be entered into, maintained or abrogated as provided by law."

Other sections provide what the license shall contain, who may solemnize the rite, the execution and recordation of the certificate, etc.; and section 4231, Comp. Laws 1909 (Rev. Laws 1910, sec. 3895), makes it a felony for a white person to marry a person of African descent. There is no penalty, however, prescribed for entering into the marriage relation, upon the parties themselves, except in the case named. There are penalties, however, prescribed against persons solemnizing the rite in certain cases, and also against the officers acting contrary to the provisions of the act.

The provisions of the statutory law prevailing in this state at this time, while differing in phraseology and substance from those in force in Nebraska when the Reaves case was decided, are not materially different in effect upon the question involved here. The Nebraska statute (chapter 52, Neb. Comp. Laws 1889) de-

fines marriage as a civil contract, depending upon the consent of competent parties, and provides that:

"Previous to the solemnization of any marriage in this state, a license for that purpose must be obtained from the probate judge in the county wherein the marriage is to take place."

It also, like our own, prescribes the form and contents of the license for a ceremonial marriage, and that it be solemnized by certain persons or officers only; and section 9 of said chapter specifically provides that, while no particular form of ceremony shall be required, yet:

"That the parties shall solemnly declare, in the presence of the magistrate or minister, and the attending witnesses, that they take each other as husband and wife; and in any case there shall be at least two witnesses, besides the minister or magistrate, present at the ceremony."

Other provisions provide for the issuance and recording of the certificate and for various penalties against officers failing to observe the statutory requirements. So we repeat that, so far as the statutes relating to the precise question involved here are concerned, all of the reasoning and the authorities quoted and relied upon in *Reaves v. Reaves, supra,* when studied closely, seem to be applicable at the present time; but it may be said that, to give our statute a reasonable construction, they prohibit persons from entering into the marriage relation except in the manner pointed out, and in a sense they do; but it is significant that they nowhere declare that marriages entered into otherwise than the statutory way are void; and this court in *Hunt v. Hunt,* 23 Okla. at page 495, 100 Pac. at page 543, 22 L. R. A. (N. S.) 1202, while discussing this question, said: .

"The rule to be gathered from all of the foregoing cases of this character is that, notwithstanding the statute may penalize those who solemnize or those who enter into marriage contrary to statutory authority, the marriage itself is not void unless the statute itself so makes it, and hence in the case at bar, although the marriage was expressly forbidden and prohibited, it was voidable, and not void. While marriage is a personal relation arising out of a civil contract, it differs to such an extent from all other contracts in its consequences to the parties and to the public that the rule that prohibited and penalized contracts are void does not apply thereto."

And it may be said that it seems to be the policy of the law almost everywhere to apply far more liberal rules in aid of its validity than are applied to the ordinary contracts of everyday life; and this court emphasizes this idea in the language of Ames, C., in the case of *Coachman v. Sims,* 36 Okla. 536, 129 Pac. 845, wherein he says:

"Marriage should not be destroyed on presumption. The law is astute to preserve the sanctity of the marriage relation, the legitimacy of children, and stability of descent and distribution, and therefore presumes innocence and virtue, in the absence of proof."

And the rule applied in testing whether or not a marriage is void or merely voidable is well stated in *Fearnow v. Jones,* 34 Okla. 699, 126 Pac. 1017, thus:

"A marriage may be considered voidable when it is possible, under any circumstances, for the plaintiffs to contract the marriage, or subsequently to ratify it, while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that it is void."

Again it may be noted that common-law marriages were held valid in the Indian Territory, now a part of our state, where at least half of our people live, where the laws of Arkansas regulating the marriage relation were in force. *Davis v. Pryor,* 112 Fed. 274, 50 C. C. A. 579 (Ind. T.) ; *Porter v. United States,* 7 Ind. T. 616, 104 S. W. 855. And yet, when we come to examine the Arkansas law (chapter 103, Mansf. Dig. Laws of Ark. 1884), we find the statutes requiring ceremonial marriage under license as strong and exact, and perhaps in some points more specific, than are our present statutes; and we feel that it may be said with confidence that it is held, by the great weight of authority, that in common-law states a marriage contract entered into in conformity to the common-law requirements is valid, notwithstanding that the statutes in force provide for a ceremonial marriage under license, and in a certain way, and by certain ministers or officers only; and that such marriages will only be held void where statutes of the state in terms declare them so. We think this is made to appear in the authorities collected in *Reaves v.*

*Reaves, supra,* and in the note to that case where it is reported also in 2 L. R. A. (N. S.) 353, but we will reproduce here the views of the Supreme Court of the United States as expressed in *Meister v. Moore,* 96 U. S. 76, 24 L. Ed. 826, as follows:

"That such a contract constitutes a marriage at common law there can be no doubt, in view of the adjudication made in this country, from its earliest settlement to the present day. Marriage is everywhere regarded as a civil contract. Statutes in many of the states, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence, they are not within the principle that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt a statute may take away a common-law right; but there is always a presumption that the Legislature has no such intention unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law, to be good notwithstanding the statutes, unless they contain express words of nullity."

The following list of cases indicate some of the states wherein common-law marriages are sustained, and, so far as we have examined, all of these states have statutes regulating how the marriage contract may be entered into: *Tartt v. Negus,* 127 Ala. 301, 28 South. 713; *Darling v. Dent,* 82 Ark. 76, 100 S. W. 747; *Klipfel v. Klipfel,* 41 Colo. 40, 92 Pac. 26, 124 Am. St. Rep. 96, 14 Ann. Cas. 1018; *Askew v. Dupree,* 30 Ga. 174; *Drawdy v. Hesters,* 130 Ga. 161, 60 S. E. 451, 15 L. R. A. (N. S.) 193; *Hiler v. People,* 156 Ill. 511, 41 N. E. 181, 47 Am. St. Rep. 221; *Franklin v. Lee,* 30 Ind. App. 31, 62 N. E. 78; *Davis v. Pryor,* 3 Ind. T. 396, 58 S. W. 660; *Porter v. U. S.,* 7 Ind. T. 616, 104 S. W. 855; *Smith v. Fuller* (Iowa) 108 N. W. 765;

*People v. Mendenhall,* 119 Mich. 404, 78 N. W. 325, 75 Am. St. Rep. 408; *Supreme Tent, etc., v. McAllister,* 132 Mich. 69, 92 N. W. 770, 102 Am. St. Rep. 382; *Hulett v. Carey,* 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, 61 Am. St. Rep. 419; *Hargroves v. Thompson,* 31 Miss. 211; *Floyd v. Calvert,* 53 Miss. 37; *In re Imboden's Estate,* 128 Mo. App. 555, 107 S. W. 400; *Eaton v. Eaton,* 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605, 1 Ann. Cas. 199; *State. v. Zichfeld,* 23 Nev. 304, 46 Pac. 802, 34 L. R. A. 784, 62 Am. St. Rep. 800; *Town of Londonderry v. Town of Chester,* 2 N. H. 268, 9 Am. Dec. 61; *Voorhees v. Voorhees' Ex'rs,* 46 N. J. Eq. 411, 19 Atl. 172, 19 Am. St. Rep. 404; *Clark v. Clark,* 52 N. J. Eq. 650, 30 Atl. 81; *Mullaney v. Mullaney,* 65 N. J. Eq. 384, 54 Atl. 1086; *Atlantic City R. Co. v. Goodin,* 62 N. J. Law, 394, 42 Atl. 333, 45 L. R. A. 671, 72 Am. St. Rep. 652; *Tummalty v. Tummalty,* 3 Bradf. Sur. (N. Y.) 369; *Hicks v. Cochran,* 4 Edw. Ch. (N. Y.) 107; *Geiger v. Ryan,* 123 App. Div. 722, 108 N. Y. Supp. 13; *In re Wells' Estate,* 123 App. Div. 79, 108 N. Y. Supp. 164; *Carmichael v. State,* 12 Ohio St. 553; *Reaves v. Reaves,* 15 Okla. 240, 82 Pac. 490, 2 L. R. A. (N. S.) 353; *Estate of McCausland,* 213 Pa. 189, 62 Atl. 780, 110 Am. St. Rep. 540; *Ex parte Romans,* 78 S. C. 210, 58 S. E. 614; *Jackson v. Banister,* 47 Tex. Civ. App. 317, 105 S. W. 66; *Burks v. State,* 50 Tex. Cr. R. 47, 94 S. W. 1040; *Riddle v. Riddle,* 26 Utah, 268, 72 Pac. 1081; *Hilton v. Roylance,* 25 Utah. 129, 69 Pac. 660, 58 L. R. A. 723, 95 Am. St. Rep. 821; *Travers v. Reinhardt,* 25 App. Div. D. C. 567.

In the instant case, both the county and district courts found that the facts were sufficient to establish a common-law marriage. The deceased took this woman in the presence of witnesses to be his wife, moved her to another town, where they lived together as man and wife, and were known as such, until the man came to his death. At the trial of this suit a little daughter, the result of this union, sat innocently by, unconscious that her very name and future status were being determined there. We infer from the record that the property involved is insignificant, and was probably little in mind, while this woman fought for the relation of wife and for a name for her little girl. She is entitled to both.

We do not propose to sit here, considering the most sacred relation of life, and construe away the status of this woman, who appears to have acted in good faith; neither will we turn the innocent result of this common-law union out into the world a nameless thing. She was begotten by a man who had voluntarily assumed the relation of husband, and she shall have the right to be called his child and bear his name.

The cause should be reversed and remanded for proceedings in harmony with this opinion. ·

By the Court: It is so ordered.