In the Matter of Estate of LUTHER E. IMBODEN, Deceased, LILLIE PIERCE IMBODEN, Appellant, v. UNION TRUST COMPANY, Executor, Respondent.

St. Louis Court of Appeals, December 17, 1907.

1. WITNESSES: Waiver of Incompetency: In an action where one party to the transaction was dead and the other party was not permitted to testify, the evidence is examined and held sufficient to show that the incompetency of the party offering to testify was not waived either by stipulation filed in the proceeding or by a cross examination in the taking of such party's deposition.

2. ————: Husband and Wife: Incompetency of Husband to Testify on Behalf of Wife. In an action against the executor of an estate in which a married woman was the sole legatee under the will of the deceased, her interest was such that her husband was not a competent witness to testify on her behalf; his contingent interest as her husband did not make him a competent witness.

3. ————: Impeaching Witnesses: Moral Character: Truth and Veracity. Under the present rule in this State a witness cannot be impeached by evidence of bad moral character; his impeachment must be confined to general reputation for truth and veracity and to such traits of character as are involved in the issues of the case. [Following State v. Pollard, 174 Mo. 607.]

4. MARRIAGE: Marriage Contract: Declarations. In an action by one claiming to be the widow of a man deceased for an allowance under the statute, where the marriage was in issue and evidence was offered to show a contract of marriage by

acts and conduct of the deceased, the alleged husband, it was competent for the defendant, executor, to introduce declarations of the deceased to the effect that he was a single man, made after the time of the alleged contract of marriage.

5. **WITNESSES: Character: Putting Character in Issue.** Where evidence was offered to show that a witness who had testified had previously made statements which would contradict his evidence, his character was thus put in issue and it was competent to show that he had a good reputation for truth and veracity.

6. ————: **Impeaching Witness: Former Testimony: Excluding Parts of Documents.** Where extracts from the testimony of a witness in a former trial were offered to contradict his testimony in the pending trial, it was proper for the opposite party to read other parts or the whole of such former testimony tending to explain the contradictions, but all such former testimony could not be read if it had not that effect, merely because a part of it had been read for the purpose of impeachment.

7. **EVIDENCE: Letters: Parts of Correspondence.** In an action by an alleged wife for an allowance under the statute, where the defendant, the executor, introduced letters from the plaintiff to the deceased, her alleged husband, for the purpose of showing there was no marriage, but the letters of the deceased to the plaintiff were not introduced, it was not error to exclude the remaining letters written by plaintiff to the deceased when offered by the plaintiff.

8. ————: **Witnesses: Character of House: Character of Witnesses.** In an action by an alleged widow for an allowance under the statute where the fact of marriage was in issue, and where it was shown that the plaintiff and the deceased, her alleged husband, frequented a certain hotel, evidence as to the character of the hotel was inadmissible, but evidence as to the character of the persons visiting the hotel was admissible.

9. **MARRIAGE: Common Law Marriage: Proof of Contract.** In an action by an alleged widow for an allowance under the statute where the fact of the marriage was in issue, and where the contract of marriage was alleged by plaintiff to have been entered into on a given date, and there was no proof of a general repute that the plaintiff and the deceased were man and wife, it was proper for the trial court to confine by the instructions the proof of the marriage to an express contract made on the date alleged; a common law marriage may be shown by express contract or by general repute.

10. **PRACTICE: Remarks of Judge: Commenting on Evidence.** It is error for a trial judge to make remarks in the presence of the

jury upon the probative force of evidence which has been introduced.

11. **APPELLATE PRACTICE: Judgment for Right Party.** After two juries have found the issues the same way in the trial court and it appears from the record that the judgment was for the right party, the judgment will be affirmed by the appellate court, notwithstanding errors committed at the trial.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

AFFIRMED.

*Joseph Wheless, W. W. Henderson, James M. Sutherland* and *Barclay & Fauntleroy* for appellant.

(1) The court erred in permitting respondent to submit to the jury the testimony of Dr. Parrish, Jr., the husband of the chief beneficiary under the will of Mr. Imboden, deceased. 1 Greenleaf, Evid., sec. 341; Swift v. Martin, 19 Mo. App. 488; 30 A. & E. Ency. Law (2 Ed.), p. 943; Davis v. Wood, 161 Mo. 17; Sup. Council v. Bevis, 106 Mo. App. 435; Miller v. Slupsky, 158 Mo. 643. (2) The learned trial judge erred in permitting the witness, Mr. Savage, to answer if he knew "what the purposes and what the character of the people visiting the Hurst Hotel" were "in 1898 up to 1903," and to answer that the "character and reputation of the people who visited there" were "bad;" and there was likewise error in allowing the same (and another) witness to testify that the "character and reputation" of that hotel were bad. 30 Am. and Eng. Ency. Law (2 Ed.), p. 1074; White v. Railroad, 46 S. W. 382; Bucklin v. State, 20 Ohio 18; State v. Hilberg, 22 Utah 27; State v. Marks, 16 Utah 204. (3) The learned trial judge erred, in a number of instances, in admitting at the trial many items of evidence of self-serving declarations by Mr. Imboden (in the absence of plaintiff) to the effect that he was unmarried; did not intend to

marry; and in admitting his will and other unsworn documents, containing declarations to the same purport while at the same trial, the learned judge (by several instructions) limited the range of plaintiff's evidence to such testimony as might tend to prove an agreement of marriage on a given date only, viz: on July 27, 1898. Bank v. Durrill, 61 Mo. App. 549; Sherlock v. Kimmell, 75 Mo. 77; Blancjour v. Tutt, 32 Mo. 576; Walker v. P. Insurance Co., 62 Mo. App. 209; Dean v. Carpet Co., 13 Mo. App. 179; Whittaker v. Whittaker, 157 Mo. 354; Gentry v. Field, 143 Mo. 411; McCune v. McCune, 29 Mo. 117; State v. Levy, 168 Mo. 521; Hammond v. Beeson, 112 Mo. 201. (4) The learned trial judge erred in excluding the deposition of plaintiff; for even if she was originally incompetent, because of interest, she was made competent by the range of defendant's cross-examination, which entered upon many topics not touched upon in chief, as to which defendant thereby made plaintiff its own witness, and waived her former incompetency; after which plaintiff should have been privileged to read her deposition, which the court refused and excluded. In re Imboden's Est., 111 Mo. App. 220. (5) The learned trial judge erred in excluding letters of plaintiff to Mr. Imboden offered as part of a correspondence whereof a portion had been previously put in evidence by defendant. Abbott's Trial Brief, Civil Jury Trials, 237; Morgan v. Farrell, 58 Conn. 413; Lindheim v. Days, 31 N. Y. Supp. 870; Lewis v. Newcomb, 37 N. Y. Supp. 8; Werner v. Kasten (Texas Civ. App.), 26 S. W. 322; Darling v. Klock, 53 N. Y. Supp. 593; Howard v. Newson, 5 Mo. 523; Reevs v. Hardy, 7 Mo. 348; Kritzer v. Smith, 21 Mo. 301; Lyon v. Batz, 42 Mo. App. 606, 618; Hammond v. Beesom, 112 Mo. 201; Baker v. Publishing Co., 103 Mo. App. 69; Beach v. Curle, 15 Mo. 116; Martin v. Miller, 4 Mo. 49; Newman v. Haps, 27 Mo. 520; Blair v. Marks, 27 Mo. 565; 1 Thompson, Trials, sec. 835;

State ex rel. v. Chick, 146 Mo. 656; Stockman v. State, 24 Tex. App. 387; Kersting v. White, 107 Mo. App. 282; Thompson v. Chappell, 91 Mo. App. 303; Veale v. Green, 105 Mo. App. 186; State v. Spivey, 191 Mo. 112; In Haeffner v. New Ers. L. Ins. Co., 101 Pa. 178; In Comm. v. Davidson, 55 Mass. 33; Todd v. Terry, 26 Mo. App. 602; Lewin v. Dille, 17 Mo. 69; People v. Hayes, 140 N. Y. 484; 23 L. R. A. 834. (6) The learned trial judge erred in rejecting the testimony offered by plaintiff, in rebuttal, to prove the general reputation of Sergeant Pierce to be good, after defendant had sought to impeach his credibility by several witnesses, purporting to retail statements by him contradictory of his testimony in chief, and by putting in evidence extracts from his testimony on a former occasion, likewise claimed to be contradictory of his last statements. Such evidence as defendant thus offered is impeaching in character. Leahy v. Railroad, 97 Mo. 174; Alkire Co. v. Tagart, 78 Mo. App. 168; Short v. Bohle, 64 Mo. App. 242; State v. Ragsdale, 59 Mo. App. 600; 1 Greenleaf, Evid., sec. 462. (7) The learned trial judge erred by making oral comments, in the presence of the jury, upon the weight and the effect of the testimony and regarding the management of the case, so as to convey to the jury an impression highly unfavorable and prejudicial to the plaintiff. Dreyfus v. Railroad, 102 S. W. 53; McPeak v. Railroad, 128 Mo. 647; State v. Hill, 91 Mo. 428; Edens v. Railroad, 72 Mo. 213; Brooks v. Barth, 98 Mo. App. 89; Wright v. Richmond, 21 Mo. App. 82; Schmidt v. Railroad, 149 Mo. 282; State v. Eatherly, 185 Mo. 182.

*J. D. Dalton* and *A. H. Roudebush* for respondent; *Jones, Jones & Hocker* of counsel.

(1) Dr. Parrish was a competent witness for defendant. 1. Because his interest, if any, in this case, as husband of Imboden's daughter, is remote and con-

tingent.   Phillips v. Poulter, 111 Ill. App. 330; Sneck-
er v. Taylor, 1 Redf. (N. Y.) 427; Railroad v. Lincoln,
29 Vt. 206; Wiley v. Hunter, 57 Vt. 479; Dyer v. Ho-
mer, 22 Pick. 253; Mitchell v. Clogett, 9 Md. 42; Purdy
v. Purdy, 67 Vt. 50; Fugate v. Pierce, 49 Mo. 441;
Steffens v. Bauer, 70 Mo. 399.    (2)  Because (if the
court should hold his interest not contingent) this suit
involves real estate of which Imboden died seized and
Dr. Parrish, as husband of Imboden's sole heir, has
such an interest as qualifies him to testify in his own
behalf.     Roberts v. Bartlett, 190 Mo. 703; Landy v.
Kansas City, 58 Mo. App. 141; Steffens v. Bauer, 70
Mo. 399; O'Bryan v. Allen, 95 Mo. 73; Brownlee v. Fen-
wick, 103 Mo. 425; Cooper v. Ord, 60 Mo. 420.    (3)
There was no error in admitting the testimony of Savage
as to the character of the people visiting the hotel.
Clementine v. State, 14 Mo. 112; 9 Am. and Eng. Ency.
Law (2 Ed.), 533.    (4)  The rule is well settled in
Missouri that witnesses may be impeached by evidence
as to morality. York v. Everton, 121 Mo. App. 640; State
v. Shields, 13 Mo. 236; State v. Hamilton, 55 Mo. 520;
State v. Breeden, 58 Mo. 507; State v. Grant, 76 Mo.
236; State v. Rider, 95 Mo. 474; State v. Schrozer, 144
Mo. 441; State v. Raven, 115 Mo. 419; State v. Smith,
125 Mo. 2; Alkire Gro. Co. v. Taggart, 78 Mo. App. 168;
State v. Pollard, 174 Mo. 621.     Declarations of Im-
boden, both oral and written, are competent to dis-
prove the alleged marriage.    In re Estate of Imboden,
111 Mo. App. 233; Topper v. Perry, 197 Mo. 531.    (5)
It is not reversible error for the trial court to exclude
a witness, unless it is shown to the court that the tes-
timony of that witness is relevant and material.   Ber-
thold v. O'Hara, 121 Mo. 88; Bank v. Aull, 80 Mo. 199;
Jackson v. Harding, 83 Mo. 175; McCormick v. City,
166 Mo. 315; Loker v. Railroad, 94 Mo. App. 485; Sum-
mers v. Insurance Co., 90 Mo. App. 691; Bank v. Wills,
79 Mo. 275; State v. Hodges, 144 Mo. 50; State v. Mar-

tin, 124 Mo. 514.	(6) By respondent introducing in evidence as admissions and declarations against interest a part of a friendly correspondence between appellant and Mr. Imboden none of which refer to, explain, or have any bearing upon the terms of the contract, the remainder of said correspondence which refers in no way to the part introduced or to the terms of the contract is not thereby made admissible.	These letters are still self-serving declarations.	Rubber Co. v. Dunckler, 30 Vt. 29; Trust Co. v. Plumbing Co., 57 Neb. 784; Stone v. Sanborn, 104 Mass. 319; Heaffer v. Insurance Co., 101 Pa. St. 178; Brayley v. Ross, 33 Iowa 508; Barrymore v. Taylor, 1 Esp. 326; DeMedina v. Owen, 3 C. and K. 72; Strong v. Strong, 1st Abb. (N. S.) 233; Ferguson v. Hely, 10 Jurist. (N. S.) 34.	(7) The court, by its instruction, properly confined the proof of the alleged marriage to the date mentioned by appellant's counsel in the opening statement and supported by the evidence.	Waddingham v. Hulett, 92 Mo. 528; Palmer v. Telephone Co., 91 Mo. App. 106; Mining Co. v. Frankenstein, 175 Mo. 564.

STATEMENT.—Luther Imboden being dead, and having by will appointed the defendant trust company executor of his estate, plaintiff, on July 3, 1903, filed in the probate court of the city of St. Louis, her petition for an allowance out of the estate in lieu of one year's provision not on hand at the death of Imboden, claiming to be his widow.	Judgment was against the petitioner in the probate court and she appealed to the circuit court, where she again failed to establish her widowhood, and the cause was appealed to this court, where the judgment of the circuit court was reversed and the cause remanded for new trial (Imboden v. Trust Company, 111 Mo. App. 220).	The cause was again tried in the circuit court and the jury found plaintiff

128 App.—36

was not the widow of Imboden, and she again appealed to this court.

It was admitted at the threshold of the trial, that if plaintiff is the widow of Imboden, she is entitled, under the statutes of this State, to an allowance of four hundred dollars in cash against the estate.   Plaintiff, to establish her widowhood, relied upon evidence of a common law marriage entered into between herself and Imboden in the year 1898.   Her father testified, in substance, as follows: "About the fourth or fifth of August, Mr. Imboden called me downstairs in the evening; I was upstairs and he said, 'Sergeant, I am about to leave the city, and I want to tell you that your daughter and I are married.   She is my wife, and we want this thing kept secret.   I promised by wife on her dying bed not to bring a stepmother into the house to my daughter until she was married;' that was in the evening, maybe half past six or seven, in the parlor at 1525 N. Taylor.   Mr. Imboden, my daughter and myself were present.   I asked my daughter, 'Lillie, is that so.'   She said, 'Yes, Daddy.'   I told Mr. Imboden I would keep the secret so long as she asked me to.   Mr. Imboden said he would make the marriage public when his daughter was married.   I said, 'That being so I will agree.'   After Mr. Imboden continued coming to my house time and time again up to the time of his death; when he was not in the city I would not see him; sometimes he would not be there for a week or two, but he would be there every evening, every day sometimes, very often in the morning.   I would get up in the morning and find him there; I saw him sometimes come and stay all day, stay the entire day.   He was there the evening before he died; he died on Monday.   He was there Sunday evening at my house.   Mr. Imboden frequently took his meals at the house with the family I have known him to be there as late as eleven o'clock or later, and he has taken breakfast there in the morn-

ing, both at the house on Taylor avenue and Evans avenue.    Mr. Imboden furnished provisions for her use, meats, vegetables and groceries, beginning in 1898 right after he announced he was married to my daughter up to the time of his death; once he gave her a check which I cashed for her.    He provided her clothing, a proportion he did.    Mr. Imboden gave my daughter a ring, flat band ring some time in the latter part of September, 1898.    He called my attention to a ring on my daughter's finger, and he said, 'Sergeant, that is my wedding ring,' and I looked at the ring (witness identifies ring worn by plaintiff shown him).    In June, 1903, I had a conversation with Mr. Imboden at the Fair Grounds race track in regard to the public announcement of the fact of his marriage; after some other conversation, Mr. Imboden said, 'Sergeant, the time will soon come when I can make our marriage public.'    I have heard Mr. Imboden call her 'my little wife, and 'little girl,' etc., such names as that.    I have seen him come into the house, put his arm around her, kiss her, take her into the parlor.    Sometimes on leaving the house it seemed he could not tear himself away; he hugged and kissed her like it was murder for him to go away.    I have seen him at the house asleep on the lounge, at both houses.    He made a trip with her to Hot Springs in the latter part of October, 1901, also a trip to French Lick, in September, 1902."    Witness further stated that Imboden said he and Lily entered into the contract of marriage on July 27, 1898.

Plaintiff's evidence tends to show that from a short time after Imboden was introduced to plaintiff, he was a constant visitor at her father's house where she resided; that he took a great many meals there after July, 1898, until the day of his death, July 15, 1903, had a key to the front door of the residence, spent a great deal of his time there and remained there over many nights, and on divers occasions was seen in plaintiff's

room; that he furnished the groceries for the family, was very attentive toward plaintiff and manifested great love for her, called her pet names, gave her a wedding ring and other jewelry, spoke of and to her as his wife in restaurants, in the city of St. Louis, and in other public places, took her to French Lick Springs and there registered himself and her as man and wife, under the assumed name of L. Pierce, took her to Hot Springs and there introduced her to an old acquaintance as his wife; that he frequently presided at the table in plaintiff's home and, as some of the witnesses put it, "acted as the man of the house." But there is no evidence showing, or tending to show, they gained the reputation of man and wife, in the neighborhood where plaintiff lived.

Imboden was a widower and had an only child, who was about thirteen years of age at the time he became acquainted with plaintiff. He had and maintained a residence at No. 4596 Garfield avenue, in the city of St. Louis (quite a distance from plaintiff's residence), where he made his home from the date of his acquaintance with plaintiff until the day of his death. His daughter testified: "My father died June 15, 1903, at 4596 Garfield avenue, St. Louis, aged 53 years. He was very regular in his habits, about coming home at night; he used to come in about ten o'clock at night; sometimes he would be later, when he went to theaters, when he would never come home until twelve o'clock; this was very seldom as I was alone, and when I had company he always liked to be there and see that I was there all right. In regard to his habits about his meals, he used to take his breakfast there, he never came for lunch, but was there occasionally; he never left the house until ten o'clock on the morning; six o'clock dinners he missed a few, very few; he never spent a night away from his home while I was in the city. I know the petitioner in this case; I have known her a number of years. I

think it was about 1898, that I first met her; I think it was in the spring. I was thirteen years old at that time. In the spring of 1898, my father and I, walking, met the plaintiff, Miss Pierce, and her mother on the street. I introduced papa to her. I sometimes called on Miss Pierce, not frequently, in 1898 and part of 1899; I think it was about the first of January that I stopped. My father was really not in any business, dealing in real estate; he had no down town office at all, his office was at his home; he dealt in real estate entirely for himself."

A number of Imboden's intimate friends testified to conversations they had with him at different periods after July, 1898, in respect to his status as a married man. Their evidence is that when the subject was mentioned, Imboden would speak of his daughter, saying he had been both father and mother to her; that he had no one else to provide for and had no intention of ever marrying again; that the memory of his dead wife seemed to be very dear and sacred to him and he would speak of her in the most reverent and sacred terms, and said he was "too old to think of marrying again."

A chambermaid at the Hurst Hotel Junior testified that Imboden and plaintiff, for four or five years from 1898, came to the hotel on an average of once or twice a week and stayed several hours in a room together. Over the objection of plaintiff, defendant offered evidence tending to prove that the moral character of people who visited the Hurst Hotel during the period from 1898 to 1903, was bad; also over plaintiff's objection, defendant introduced evidence tending to show that the character of the hotel was bad.

Mrs. Mary Lambert testified that a short time after Imboden's death she saw plaintiff and had a conversation with her about Imboden's death; that plaintiff said she was very much grieved because she had not been

remembered in his will, that she could make no claim, as she had no proof; also that plaintiff had told her she was engaged to Imboden..

Mrs. L. M. Fields testified that sometime in July, 1903, plaintiff said to her, " 'I suppose you are very much surprised to hear of this case?' I said, 'Yes, I was very much surprised, very sorry.' I said, 'How could you bring your name before the public in this way?' She said that she thought it was time she was getting money some way. I said, 'Lillie, why were you not smart enough to get it before his death?' She said, 'I didn't think he was going to die so soon.' "

Mrs. Rosa Burk testified that she was housekeeper for Imboden, and he was taken sick on the twenty-fourth or twenty-fifth of July, 1898, and continued sick for twelve or fifteen days and did not leave the house for about two weeks; that Dr. C. Kerley attended him during his illness.

George H. Wagner, a druggist, identified two prescriptions for medicine written by Dr. Kerley for Imboden, one dated July 25th, and the other July 28, 1898.

Mrs. Mae Bradley testified she was the daughter of Dr. Kerley and identified a book kept by her father in his handwriting. This book shows Dr. Kerley made professional visits to Mr. Imboden on July 25th, 26th, 27th, 28th, 29th and 30th, 1898.

Imboden's daughter testified her father was subject to spells of indigestion. He died very suddenly of heart disease.

Defendant had about thirty letters written by plaintiff to Imboden, thirteen of which were offered in evidence. Plaintiff offered the remainder of these letters in evidence. They were objected to and excluded by the court. The most damaging of the letters read in evidence was dated November 20, 1900. In part, it is as follows:

"My Own Sport:

"Yours of Sunday and yesterday just received.

"Your letter of yesterday places me in a very peculiar position, and as willing as I am to accede to your every wish, I cannot see how I can comply in this case without being considered either a fool or very little of a lady, to write at this late hour when it is this evening that I expect the gentlemen I can offer no reasonable excuse, save one:—and that I am sure you would not wish, and that is—to say frankly—Mr. Imboden objects. The question would then arise, why was I not given to understand the relations you hold to each other? if they are such that no gentleman dare show you any attention, simply as an acquaintance.

"All this places me in a very bad position, and you should have told me in the beginning that you objected to his calling.    I have not intended to carry our acquaintance any further than this.    Your talk on the day you left made the impression on me that I am sure you desired me to have, if I had ever felt or thought otherwise, and it was clearly this:—'I am yours so far, no farther and when the right man comes, I will be happy to see you marry him.'

"I wish no man in this relation, but if I did how would I ever find him if I received none?

"And now what more can I say I can comply with your request this far; if, after I hear from you, you wish me to tell him I will not receive him again, and that it is in compliance with your wishes, then I will not hesitate to do so, I care nothing for him or any other man save one, and for him I think I have proved my feelings, and I thought you had such confidence in me that nothing could shake it.

"After all, is it as bad as my being alone every summer since I have known you?    Did I not entertain others and such a one as that one was and last summer

at Nora's did I not see others? only to compare them all to My Sport.

"You say you know 'it is a little lonely' in your absence, but 'if you can stand it I should;' there is no comparison; you are out in the world, busy, and have associates, among men, I have none, men, or women, that I wish to go with, a mother sick all the time, no society in my home life, and even now my mother has been quite sick and I am deprived of even this much, and from dusk until bedtime I think I cannot endure it. You may say a 'shallow mind;' you know differently; but I have narrowed my entire thoughts and heart to you and you are my world.

"But there, dear, you know all this too well.

"I will gladly agree not to receive the gentlemen (save perhaps once more, if he takes my selections to copy and asks to return them) but in the meantime if you will tell me what to tell him I can write him to mail them."

In all the letters read in evidence Imboden was addressed as "My Dear Sport." In some of the letters other admirers of the plaintiff are mentioned, and while there are very strong expressions of plaintiff's love and devotion to Imboden in all the letters, not one of them is such a letter as a virtuous wife would write her husband, but are such as a devoted mistress would write a man with whom her relations were meretricious.

Imboden executed and acknowledged deeds conveying real estate, after the date of the alleged marriage contract, in which he declared himself to be a single man. On January 10, 1900, he made his will in which he declared himself to be a widower. His daughter married Dr. J. G. Parrish, Jr. Over plaintiff's objection, Dr. Parrish was permitted to testify. He swore he began his visits to Imboden's house in 1900, and con-

tinued to make his calls once or twice every week thereafter; that Imboden was sometimes at home, and if not he generally remained until he came in, which was always about ten o'clock p. m.

Plaintiff was offered as a witness in her own behalf but was excluded on account of incompetency. It is claimed her incompetency had been waived in two ways; first, by a stipulation filed with depositions taken while the case was pending in the Probate Court; second, by her cross-examination when her deposition was taken.

On the examination of one of plaintiff's witnesses, the following occurred:

"Q. What did he (meaning Imboden) say that he had bought her?

"Mr. Dalton: We object as immaterial.

"Q. (Continuing.) In addition to the articles of clothing that you already mentioned.

"Mr. Hocker: We renew our objection.

"The Court: I am assuming that there is going to be some evidence of a marriage; of course every word of this evidence is immaterial under the statement of counsel that they are relying upon a marriage contract; if they were relying upon a reputed marriage perhaps, this evidence would be material. The court, under the pleadings in this case, is in the dark; I have to allow anything to go in that may under any theory be competent.

"Mr. Hocker: I think your Honor should have the proof go in in order.

"The Court: If they are relying on an agreement to marry, none of this proof is competent; if they are relying upon a reputed marriage, the testimony is competent; the objection is overruled.

"Mr. Barclay: I want to ask to except to your Honor's remark, and have exceptions apply to your Honor's remarks now. I want to save exceptions to

the remarks of your Honor as to the effect of this testimony.

"The Court: What do you mean?

"Mr. Barclay: I except to your Honor's remarks with respect to the evidence, and ask the exception be noted covering your Honor's remarks and the general objections we make in the progress of the case.

"The Court: There is no testimony at this time of any marriage that I know of.

"Mr. Barclay: We are not obliged to introduce evidence according to anybody else's idea.

"The Court: However, you understand that evidence may be competent after other evidence has been introduced which is not competent before the other evidence is introduced. Now the court is left in the dark by the pleadings in this case as to what is relied upon; that is what I mean.

"Mr. Barclay: What we object to is your Honor's remarks as to the effect of this testimony; your Honor's remarks in regard to the effect of this testimony; we except to this comment upon the evidence, would prefer to let the objections go in under the general understanding.

"The Court: With respect to any statement that the court makes, better make exceptions so that we will know where we stand, make them as you go along.

"Mr. Barclay: The objection is to the remarks about the effect of this testimony. I think the objection sufficiently explains itself.

"The objection to the question as asked is overruled.

"Mr. Barclay: My exception is noted to the remarks."

Sergeant Pierce was asked if he did not make certain statements to persons named, contradictory to his evidence on the trial, for the purpose of laying a foundation for impeaching him. He denied making the

statements, and the persons named in the interrogatories were introduced as witnesses and swore that he made the statements.    In rebuttal plaintiff offered to prove Pierce's reputation for truth and veracity was good in the neighborhood where he lived.    This evidence was objected to and the objection sustained.

BLAND, P. J. (after stating the facts).—1.    The circuit court, on defendant's motion, struck out the stipulation filed with the depositions taken while the case was pending in the probate court, on evidence introduced in support of the motion, showing that the stipulation filed with the depositions was not the stipulation signed by defendant's counsel; that the one signed by counsel did not waive the plaintiff's competency as a witness.    In respect to the other point, that plaintiff's competency was waived by defendant going beyond the scope of her direct examination in its cross-examination, at the time her deposition was taken, we have carefully read the whole of plaintiff's deposition, direct, cross and redirect examination, and fail to see wherein defendant went beyond the range of her examination in chief in its cross-examination; no new matter was elicited whereby it can be reasonably said defendant made plaintiff its own witness and thereby waived its objection to her competency.

2.    Imboden's daughter is the sole legatee under his will and the property devised to her is, under our statutes, her sole and separate property.    Her husband, Dr. Parrish, has only a contingent interest in the estate and was not a competent witness by reason of any interest he had in the matter in controversy, or in the estate of Imboden, and was therefore not competent to testify in behalf of his wife.    [1 Greenleaf on Evidence, sec. 341; 30 Am. and Eng. Ency. Law (2 Ed.), 942; Swift v. Martin, 19 Mo. App. 488.]

3.    The character of some of plaintiff's witnesses

was impeached for immorality and integrity.    Prior to the case of State v. Pollard, 174 Mo. 607, 74 S. W. 969, the rule in this State was, that a witness might be impeached by evidence of bad moral character as well as by evidence of bad character for truth and veracity. The Pollard case holds that the rule, that a witness may be impeached by showing his bad moral character, is opposed to the current of authority and that the impeachment should be confined to general reputation for truth and veracity and to such traits of character as are involved in the issues of the case.

4.    Objections were made to the evidence showing that Imboden, after his alleged contract of marriage with plaintiff, declared himself to be a single man.    The same objection was made when the case was here on the former appeal.    We held then that declarations of members of a family in respect to marriages, births and deaths were admissible.    Plaintiff claims Imboden was a member of her family; that she was his wife and that he maintained her family and spent a great deal of his time at her home, and thereby laid a foundation for the introduction of this character of evidence.    [Imboden v. Trust Co., 111 Mo. App. l. c. 234, 86 S. W. 263.]

5.    Error is assigned in the refusal of the court to hear evidence of the general character of Sergeant Pierce for truth and veracity.    Proof of Pierce's good character would not tend to explain a statement made out of court, contradictory to his evidence as given in court, yet, as Professor Greenleaf says, "His (the witness) general character for truth being thus in some sort put in issue, it has been deemed reasonable to admit general evidence, that he is a man of strict integrity, and scrupulous regard for truth."    [1 Greenleaf on Evidence, sec. 469.]    The Missouri cases seem to follow Greenleaf, though in many States such evidence is held incompetent.

6.    Sergeant Pierce's evidence on the last trial dif-

fered, in some respects, from his evidence as given on the first one, and parts of his evidence were read from the bill of exceptions filed on the first trial, for the purpose of showing these contradictions. Plaintiff then offered to read the whole of his evidence, as preserved in the bill of exceptions. The court, on objections by defendant, refused the offer. This ruling is assigned as error. The evidence given on the former trial is not in the abstracts and we cannot tell whether the offered evidence would or would not have explained the contradictions. Of course, plaintiff had a right to read from the bill of exceptions, any part of Pierce's evidence, which explained, or tended to explain, the contradictions, and to read the whole of it, if necessary, for this purpose, but she had no right to read it all merely because a part of it was read by defendant for purposes of impeachment.

7. Error is assigned in the refusal of the court to admit all of plaintiff's letters to Imboden. The argument made if we properly understand it, is that the letters were a part of the *res gestae* of the transaction, that is, of the continuous relation of plaintiff with Imboden, and tend to prove that status and how Imboden and plaintiff regarded their relation. That might be true if Imboden's letters to plaintiff had been also offered in connection with hers to him, but they were not. The letters offered by defendant were offered on the theory that they contained admissions against interest and were admissible on that ground. Besides, we are unable to see how the excluded letters would have benefitted plaintiff's case had they been read in evidence.

8. Evidence of the character of the Hurst Hotel Junior was inadmissible; evidence of the character of persons who visited it was admissible.

9. In the instructions, the court confined the proof of marriage to July 27, 1898, and instructed the

jury, in effect, that unless they found from the evidence that plaintiff and Imboden, on July 27, 1898, agreed with each other then and there to be husband and wife, they should find for defendant.    A common law marriage may be shown by express contract, or by proof of cohabitation as man and wife, and general repute. There is no evidence that plaintiff and Imboden were reputed to be man and wife; no evidence that they continuously cohabited together as man and wife; it is to the contrary.    On the first trial, plaintiff's mother was a witness and testified the contract was entered into, in her presence, at her home, on July 27, 1898.    She was not a witness at the last trial, and the date of the contract of marriage was fixed by Sergeant Pierce, as July 27, 1898.    Plaintiff's theory throughout this controversy has been that she and Imboden expressly agreed, on July 27, 1898, to be man and wife, and unless there was an express contract made at that date, or at some other date, between them to be man and wife, plaintiff had no case.    There is no evidence that the contract, if made, was made on any other date than July 27, 1898, hence there was no error in confining the contract to that date.    All the other evidence in respect to the marriage was but circumstantial, and admissible for the reason it tended to corroborate the theory of plaintiff's case, that is, that there was an express contract between her and Imboden to be man and wife, made and entered into on July 27, 1898.

10.    In respect to the remarks of the learned trial judge, in the presence and hearing of the jury, of the probative force of certain evidence plaintiff was offering, and which was afterward admitted, we will say they were improper, for the reason they were calculated to influence the jury to disregard the offered testimony and look with suspicion upon all plaintiff's evidence of a similar character.    The case was in court on no formal pleadings.    The court was in the dark as to the

issues, and, in the multitude of counsel representing both sides, and in something of a wrangle about the course which should be pursued in the introduction of evidence, the learned trial judge doubtless became confused and irritated and unwittingly made the remarks attributed to him, yet they were improper under any circumstances and should not have been made.

11.   Should the case be reversed and the cause sent back for a new trial on account of the errors noted? We think not.   Plaintiff's case is a very weak one, barely sufficient to warrant its submission to a jury. The probate court and two juries have found she is not the widow of Imboden, and it is not at all probable —barely possible—that a third jury would reverse these findings.   We are of opinion the judgment is for the right party and ought to be affirmed, notwithstanding the errors noted.

The judgment is affirmed.   *Nortoni, J.,* concurs in the result, *Goode, J.,* not sitting.